## Moses Taggart, Attorney General, v. The City of Detroit.

*Municipal corporations—Public franchises—Action by Attorney General to prevent destruction—Markets—Detroit city charter.*

1. That holding a public market is an important public franchise is an elementary principle of law.

2. There can be no doubt of the right and duty of the Attorney General to intervene and prevent franchises of a public nature from usurpation or from destruction.

3. All franchises are given for the purpose of securing some advantage to the public, and, when once exercised, the public have very generally a right to complain of their relinquishment.

4. Markets are as old as civilization, and public market places have in many countries been identified with the most important events in their history.

5. The purpose of markets has always been to secure to all persons the privileges and conveniences arising from a general concourse of buyers and sellers, one main object being to enable producers to meet consumers of the usual necessaries of life directly, and without the interference of middle-men.

6. In this case the defendant is enjoined from interrupting the use of the market property, or any part of it, or any of the buildings heretofore used for market purposes, and directed to continue to maintain the market as such, and collect and apply the income for the purposes required by the statute of 1875, as amended by the law of 1881, and in no other way.

Appeal from Wayne. (Hosmer, J.) Argued June 8 and 12, 1888. Decided June 22, 1888.

Information in the nature of a bill in equity to restrain the city of Detroit from discontinuing the Central public market in that city. Complainant appeals. Decree reversed, and one entered granting relief prayed for. The facts are stated in the opinion.

*John J. Speed* (*F. A. Baker,* of counsel), for complainant.

*John W. McGrath,* for defendant.

CAMPBELL, J. The Attorney General filed his information in the nature of a bill in equity to restrain the city of Detroit from discontinuing the Central public market in that city. The court below, upon an answer not controverting anything material in the information, dismissed the bill, but we are not informed whether this was done for a supposed lack of authority in the Attorney General, or for want of equity. Both of those questions were argued. The Attorney General appeals.

There can be no doubt of the right and duty of the Attorney General to intervene and prevent franchises of a public nature from usurpation or from destruction. That holding a public market is an important public franchise is an elementary principle of law. In *Rex v. Marsden,* 3 Burrows, 1812, it was doubted whether an information ought to be granted in favor of a private owner of such a franchise against usurpation by another private person, because there were other sufficient remedies; but it was recognized that the public interests might be protected by that process. And in *Rex v. Starkey,* 7 Adol. & E. 95, it was held an offense punishable criminally to remove a market to the detriment of the public, as it may be actionable to do so in some other cases. *Ellis v. Bridgnorth,* 15 C. B. (N. S.) 52. The nature of these public interests will be considered presently. There is no doubt of the right of the Attorney General to intervene.

The remaining questions relate to the mischief that is sought to be prevented and redressed. The most convenient method of explaining this will be to give the legal history,—of which we must take judicial notice,—in connection with the facts which explain it.

From the time of the first city charter in 1806—and perhaps still earlier—there has never been a time when the city of Detroit has not been at least authorized, if not required, to maintain public markets. For a large part of this period the appointment or election of market clerks has been obligatory, from which we might be bound to infer, what this record shows, that one or more public markets existed from the earliest period. Prior to 1833 the public market place, which included also a market building, is known historically, and probably from various public uses to which it was put may be known judicially, as having been situated between Jefferson avenue and Detroit river, on Woodward avenue. At least one other market was described by territorial legislation, which need not now be referred to

In 1833—no doubt from the necessity of more space— the question of the location of the Central market was submitted to a vote of the citizens of Detroit at a regularly called citizens' meeting. The selection of a location was between Woodward avenue, below where it then was, and Michigan Grand avenue (lately renamed Cadillac square), where it now is. Inasmuch as these streets are described in our statutes, we know that Woodward avenue was 80 feet narrower than Michigan Grand avenue, and it appears that the extent of the latter made much more room for a market than the other would have furnished. It was decided at that meeting to have the market on Michigan Grand avenue. A building was erected, fronting on the Campus Martius, at the head of that avenue, for the combined uses of a city hall and market, extending along the middle of the avenue originally about 100 feet. The lower story was used for meat-stalls. Vegetables were sold in an open building not much sheltered except by a roof extending back in the avenue from the brick building, and the country wagons for the sale of

market products were gathered along the avenue for some distance further.    In process of time the buildings, both open and closed, were carried along so as to occupy the central part of the avenue to Randolph street, except as crossed by Bates street.    In this way the whole of the avenue along its middle portion was made a market place, sometimes called the " City Hall Market," and sometimes the " Central Market."

From the repeated litigation which has come into this Court, we may infer that it was to avoid vexation from adverse interests that in 1848 it was deemed desirable to formally vacate the middle 50 feet of Michigan Grand avenue through its entire length, and, in addition to action by the council, to obtain a condemnation under the right of eminent domain, and the jury of inquest rendered a verdict in favor of such vacating.    From that time to the present the city has occupied and claimed the whole space by title in fee, and used it for market purposes.    Whether the fee then really belonged to the city ceased to be a practical question after the lapse of time, which was sufficient to bar any adverse right.

In *Cooper v. Detroit*, 42 Mich. 584 (4 N. W. Rep 262), when the city of Detroit proposed to build the Central market building referred to in the pleadings before us, as a part of the Central market system, it was claimed by the bordering land-owners, who desired to prevent it, that this long occupancy for market purposes was not proprietary, and was not, therefore, effective.    But it was held by this Court that such an occupation was proprietary, and therefore protected by the statute of limitations.    It was urged on the argument of the present case that, when we declared the right to be proprietary, we in effect held that the city could do as it should choose to do with its property.    But under the common law it was the general doctrine that no one could hold a market that did not

own the freehold of the land, and, if the public have any rights in the matter, we think the fact of city ownership cannot be of any importance in limiting them. While there may be a great deal of property owned in fee by a city, and its rights may be proprietary, yet all these rights belong to the municipality as a public corporation; and it is by no means inconsistent with the title that there may be trusts or obligations in regard to them.

It appears from the bill that in 1872 the city took down the brick buildings fronting on the Campus Martius, and left the whole space open from that place to Bates street. The whole strip from the Campus to the other end of the avenue had been, in 1848, declared by the council to have been vacated for market purposes, and designated and set apart as a public market to be known as the "City Hall Market." No attempt was ever made to put an end to that designation of uses, although it is quite possible that the delay in rebuilding may have been in part owing to a desire—such as is now manifested—to turn the market into something else. But the chief reason was, no doubt, the large expenditure for a new city hall in place of the old market building.

In 1875 authority was obtained from the Legislature by special act to raise money for a new market building by borrowing money on market bonds. As the immediate occasion of a part of this complaint arises out of an alleged violation by the city of the conditions then imposed by the Legislature, it will be necessary to refer to it particularly. The act not only imposed condition on the loan, but also directed what use should be made of the building when completed. Laws of 1875 (Local), p. 537. By this statute the common council received authority to borrow not more than a hundred thousand dollars, on bonds pledging the faith of the city. These bonds were to be denominated "Central Public Market Stock of the City

of Detroit."` They were to be in sums not less than $500 each, to bear not more than 7 per cent. interest, and not be sold at less than par.   They were to be payable not more than 20 years from date, and their proceeds were to be credited to the "Central Public Market Fund" and—

"Applied exclusively to the purposes of erecting a Central public market in the city of Detroit."

The law further provided that "the rents,· fees, and profits derived from the said Central public market" shall be applied—

1. To payment of interest coupons, and to establish a sinking fund to provide for the payment of the bonds, for which purpose $5,000 should be annually invested in the said sinking fund.

2. To market expenses and repairs.

3. The bonds were to be made payable $5,000 in each year from issue, "and the same shall be paid from the money provided for in said sinking fund."

The law then declared in regard to the use of the building that one story should be set apart as a free public hall and for city offices.   In 1881 the law was so amended as to substitute court-rooms for the public hall.   Law of April 21, 1881.

No subsequent action has been taken by the State Legislature on the subject.   There is no force in the suggestion that the new or amended charter contains room for a different financial scheme.   The frequent and careless revision and re-enactment of charters for Detroit has led to a good deal of confusion, but it cannot be assumed that the re-enactment or modification of charter provisions is intended to affect special legislation outside of the charter without a very manifest indication of such an intent. This is especially true where such an interpretation would affect important rights, and diminish funds set apart for specific uses.

Under this enabling act of 1875, the city built the new, building on the site of the old market building known as the "City Hall," and issued bonds, of which between twenty and thirty thousand dollars have not yet matured, but have been purchased for the city, and placed in its general sinking fund. The city seems to have failed in its duty to keep up a separate market sinking fund.

On March 6, 1888, the common council accepted a committee report, subsequently put into resolutions and ordinances, abolishing the Central market, vacating the market buildings and open spaces as used for market purposes, and directing the disuse for such purposes after July 1, 1888, and providing for the use of the new building for general city purposes. This is the action which the Attorney General has brought to our attention, and which he asks us to restrain and set aside.

On the argument for the city an attempt was made to treat this building as the entire market, and to claim that it was insignificant for market purposes. And in the same line of argument it was insisted that for market purposes the income would be insignificant, and that; being the private property of the city, there was no reason why the city should not treat these sinking fund bonds as paid, and use the building as it chooses. The other property was referred to as having no part in this controversy, and as not protected.

Whether the building stands alone or not, there can be no doubt that the law positively requires it to be paid for out of market revenues, and not by taxation. It may be true that the city would be obliged at maturity to pay the bonds at all events, whether receiving income enough or not. But it is equally true that it would be a fraud on the tax-payers, and a violation of the act of the Legislature, to relinquish the fund set apart for that

purpose, which was made a trust fund, and charge its value as a general city charge.    The power to pay these bonds by taxation was not meant to be granted unless the other means failed ; and if it should become necessary to resort to it, that necessity can only arise from the direct breach of duty of the council, which has no right to squander or throw away the public funds.    The argument that the bonds are actually paid is fallacious.    The city sinking fund is in law a fund which has value in securities, and the market bonds are as much property as if they were government bonds.    They can only be exchanged for actual money equivalents.    A cancellation of these bonds would be a withdrawal for market purposes of the same amount of funds belonging to other purposes.    The fact that the city has not in fact kept the market sinking fund distinct can make no difference. It is bound to keep it untouched, and, if funds have been diverted, the city is bound to restore them where they belong.    Until the Legislature shall see fit to provide otherwise, there can be no step taken to use the trust property for other purposes, without a direct violation of legal duty, and it cannot be allowed.

It may be further noted that the Legislature has provided expressly for the occupation of the whole building, which would not have been done had there been any design of leaving the city liberty to use it at discretion. In the original act the upper stories were allowed to be used for a public hall and city offices.    In 1881 the use was modified so as to substitute court-rooms for the hall. This, of itself, shows the city was intended to have no discretion about the market uses.

But it is manifest that this building was not designed to be separated from its surroundings.    It would be little, if any, short of absurdity to suppose that this legislation contemplated nothing more extensive than a small meat-

shop. While that might in some cases be treated as a
market, it would be a very narrow use of that word, and
on so small a scale would involve nothing of a real public
character. It is probably true, as counsel suggested, that
the entire range of stalls apart from their surroundings,
would not rent for enough to justify the outlay in build-
ing. And it is also reasonably certain that they would
not be of much public convenience.

But this building was placed by the city, and was no
doubt understood by the Legislature, as headquarters of
a large existing public market, which would be somewhat
imperfect without meat-stalls, while meat-stalls would be
of little profit aside from the ordinary market customers.
The city, until the recent action, has always kept them
identified, and they cannot be dealt with separately with-
out violating good sense, as well as destroying the essen-
tials of a public market.

It has already been suggested that a market is an import-
ant public franchise. Perhaps if the city had never kept
up a market, there might be some doubt whether a court
could by civil proceedings interfere to compel it. But
the charter contains many provisions not suited to a city
without markets, and requires some officers to be chosen
who, in such a case, would have no duties. And the city
has had the benefits of this franchise for three-fourths of
a century, and continually acted under it.

All franchises are given for the purpose of securing
some advantage to the public, and, when once exercised,
the public have very generally a right to complain of their
relinquishment; and reference has already been made to
the criminal quality of a destruction of such public inter-
ests. Markets are as old as civilization, and public mar-
ket places have in many countries been identified with the
most important events in their history. The purpose of
markets has always been to secure to all persons the

privileges and conveniences arising from a general concourse of . buyers and sellers.    One ·main object is to enable producers to meet consumers of the usual necessaries of life directly, and without the interference of middle-men.    The charter of Detroit has always contained authority to prevent forestalling and regrating, and the city has always had ordinances on that subject, which have no place in the absence of market facilities.    Freedom of access to farmers and gardeners and all other persons having provisions and the like to sell, so that purchasers may get supplies directly from them, as well as find all the different varieties of supplies in the same place, is regarded as an important legal right which should not be interferred with.    The other chief value of markets is the facility of regulation and inspection, which cannot exist very perfectly, if at all, where there is no central place of concourse for buying and selling.    The acceptance of the franchise involves the duty of using it to the public welfare and utility; and, when the rights of the public have once become vested in such a franchise, something more than municipal caprice must exist to change or destroy it.

In a market the producer of articles, however small in value, can find a chance to sell them for all that they are worth; and those whose products would not justify them in setting up places of business can have the same liberty of trading as any one else.    The destruction of a market means the destruction of many of the small producers, who have no other means of gain or livelihood.    Courts have nothing to do with the theories of economists.    The law of the land has always favored, and probably always will favor, the protection of both buyers and sellers against such practices as will prevent · either from escaping the mischiefs of monopolizing provisions.    Public markets have always served this purpose, when properly managed; and

they are the only means whereby small dealers in such
articles can dispose of them to full advantage. This, as
before stated, is legally recognized as such a public right
that, when once vested, it cannot be capriciously destroyed.
There are few cities in the United States that do not owe
much of their business prosperity, and much of their
enterprise, to the energy and thrift of citizens who began
and have sometimes kept up their active career in the
public markets. The city of Detroit is greatly indebted
to men and women who have been connected with this
very Central market. A large share of the magnificent
endowment of Harper hospital came from the invested
earnings of a vegetable stand there, where the keen, honest
face of Nancy Martin was seen daily until age and infirm-
ity withdrew it.

In the case before us the law has expressly saved this
market from being meddled with until the bonds have all
been paid in due course of maturity out of the sinking-
fund set apart for them. The duty of maintaining the
market out of the revenue not set apart for the sinking-
fund is quite as explicit as the other. And the market
contemplated to be kept up is the market as an entirety,
and not the meat-shops, which form but a part of it.

That a city may change the location of markets, where
it will not injuriously affect public rights, is very gener-
ally accepted. That it cannot capriciously destroy them,
unless the charter gives distinct power to do so, seems to
be a necessary inference from the general rules governing
the use of franchises, which are seldom, and in cases of
public enjoyment are never, given as mere sources of
revenue without regard to the public convenience. We
are saved the necessity of considering these questions by
the terms of the city charter, and by the law under
which this market fund was authorized, and which created
specific duties which appertain to the conditions of the

loàn, as well as to the immunity of citizens from taxation to meet the payments on the loan, when it can be met out of the income of the market.

. There is not very much American law on the subject of markets. Their general conditions have so generally remained unchanged that the old usages have been followed without controversy. There are few, if any, popular institutions so universally retained, and few ·that have served a better purpose. The law, as found in the standard text-books and digests of the older authorities, stands practically unaltered in any feature of public utility. See Bac. Abr. "Fairs and Markets;" Com. Dig. "Markets;" 1 Bl. Comm. 274; 3 Bl. Comm. 218; 2 Co. Inst. 220, c 31; *Townend v. Woodruff*, 5 Exch. 506; Toml. Law Dict. "Market;" *Rex v. Burdett*, 1 Ld. Raym. 149.

Since the argument our attention has been called to a very recent decision in the case of *Fazende v. City of Houston*, 34 Fed. Rep. 95, in which the facts were almost literally identical with those before us, except that the suit was brought by a private bondholder; and the court held as we hold, that the city could not change the use of the property, or divert the income of the fund.

It does not appear, as no testimony has been taken, why the common council was induced to resort to the measures complained of. They involve a complete throwing away of valuable income yielding property, and a plain violation of the vital conditions imposed by the law authorizing the market loan. The Attorney General has only done his duty, and the mischief threatened must be stopped. The decree below must be reversed, with costs of both courts, and defendant must be enjoined from interrupting the use of the market property, or any part of it, or any of the buildings heretofore used for market·purposes, and directed to continue to maintain

the market as such, and collect and apply the income for the purposes required by the statute of 1875, as amended by the law of 1881, and in no other way.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred. LONG, J., did not sit.