THE PEOPLE v. ANTHONY KEIR.

[See 71 Mich. 92; 75 Id. 574.]

*Municipal corporations — Ordinances — Markets — Obstruction of streets.*

1. A proviso to a section in a city charter requiring that all ordinances shall be published for three successive days and take effect in ten days after their enactment, which empowers the

common council to prescribe a different period, and provides that no ordinance shall take effect before one publication thereof, means that no ordinance can be enforced, and violation thereof punished, until the public have been informed of its enactment by at least one publication; the matter of publication being only essential before enforcement. *Stevenson v. Bay City*, 26 Mich. 49.

2. Section 11 of chapter 66 of the Revised Ordinances of 1884, of the city of Detroit, as amended April 5, 1889, does not prohibit farmers and gardeners from selling their produce through the city, or from casually stopping their wagons for that purpose, but is intended to prevent such wagons standing in the streets for the purpose of selling such produce, and with no intention of moving until it is sold, and is a reasonable restriction upon all classes, and within the power of the council to adopt, under a section of the charter giving them power " to prohibit and prevent incumbering or obstructing of streets," etc., " with vehicles, animals," etc.

*Certiorari* to recorder's court of Detroit. (Chambers, J.) Argued October 24, 1889. Decided November 15, 1889.

Respondent was convicted of selling produce on the streets of the city of Detroit contrary to an ordinance of said city. Conviction affirmed. The facts are stated in the opinion.

*Wisner, Speed & Harvey (John J. Speed*, of counsel), for petitioner.

*Robert T. Gray*, for respondent in *certiorari*.

[The points of counsel are stated in the opinion.— REPORTER.]

LONG, J. The defendant was prosecuted and convicted in the recorder's court under the following ordinance of the city of Detroit, and adjudged to pay a fine of two dollars:

" An ordinance to amend section 11 of chapter 66 of

the Revised Ordinances of 1884, as amended April 5, 1889.

"It is hereby ordained by the people of the city of Detroit:

"SECTION 1. That section 11 of chapter 66 of the Revised Ordinances of 1884, as amended April 5, 1889, be, and the same is hereby, amended so as to read as follows:

"'SEC. 11. All farmers and gardeners selling, or offering for sale, from wagons, carts, or other vehicles, within the limits of the city of Detroit, any grain, vegetables, fruits, meat, live calves, sheep, poultry, or other articles of produce, shall occupy and stand with such wagons, carts, or other vehicles, and nowhere else, on the Central market, Cass market, and Eastern and Western markets, in the places established according to the first preceding section, where the market clerk, or other officer in charge of such markets, shall direct: Provided, That no person, while selling, or offering or exposing for sale, any of the above-named articles, shall permit any wagon, cart, or other vehicle to stand or remain on Bates street, Randolph street, Cadillac square, Congress street, Campus Martius, Monroe Ave., or Woodward Ave., within a distance of 500 feet from any part of said Central Market grounds.'

"SEC. 2. This ordinance shall take immediate effect.

"Approved August 2, 1889."

On the trial, it appeared that the defendant is a gardener, and resides some two miles outside the city limits; that about 6 o'clock in the afternoon of August 10, 1889, he drove upon Cadillac square, on the south side of the walk between Bates street and the market building, with his wagon, backed up to the walk, filled with vegetables; and he continued there, selling from his wagon, until half past 7 o'clock. At the time the defendant first stopped there, he was notified of the city ordinance, and that a complaint would be made against him if he continued selling in that place. While his wagon was so backed against the walk, his horse faced outward into the street, nearly to the street-car track, and at times the wagon was backed upon the sidewalk. The place he

occupied was within 10 feet of the Central Market grounds.

At the close of the testimony, defendant's counsel moved to quash the complaint on the ground that the ordinance is invalid, for the reason that the same was ordered to take immediate effect; and, *second,* that there is no authority under the city charter for the enactment of said ordinance.

The provisions of the city charter relative to the publication of ordinances, and the time of their taking effect, are that—

"All ordinances shall be published for three successive days in such official daily newspaper, and shall take effect in ten days after their enactment: *Provided, however,* That the common council may fix and prescribe a different period, and that no ordinance shall.take effect before one publication thereof." Local Acts of 1883, p. 602.

The ordinance in question was approved August 2, 1889, and the full three days of publication had elapsed before its violation by the defendant, though the full ten days had not elapsed before that time from the date of its approval. The proviso means that no ordinance can be enforced, and violation thereof punished, until the public have been informed of its enactment by at least one publication. The matter of publication is only essential before enforcement. *Stevenson v. Bay City,* 26 Mich. 49. It must be held that the ordinance was in force at the time of the act complained of.

Counsel for defendant claim, upon the other question raised, that the ordinance makes no provision in reference to the manner of selling, nor as to the place of standing, or the remaining of the wagons, in reference to public travel, but in effect totally prohibits the selling, or offering for sale, of products of any description from wagons; that it is an unnecessary, harsh, and oppressive

restriction, not only as to producers, but to those desiring to purchase; that it is unnecessary and unreasonable, with reference to its avowed object, to prevent the obstruction of the streets, as the present ordinances are sufficient for that purpose; and that its object, apparent upon its face, is the creation of a monopoly of the trade by the hucksters occupying stands in the market.

Power is granted to the common council by the city charter of Detroit to establish markets, market-places; to lease market stalls, booths, and stands; and to provide fully for the good government and regulation thereof. Local Acts of 1883, p. 608, § 41.

In *Attorney General v. City of Detroit*, 71 Mich. 92 (38 N. W. Rep. 714), the legal history of this market-place, as a public market, is fully discussed by Mr. Justice CAMPBELL, from which it appears that this place, now called "Cadillac Square," was designated and set apart for a public market as early as 1833. Upon this—

"A building was erected, fronting on the Campus Martius, at the head of that avenue [Michigan Grand avenue], for the combined uses of a city hall and market; extending along the middle of the avenue, originally, about 100 feet. The lower story was used for meat stalls. Vegetables were sold in an open building not much sheltered except by a roof extending back in the avenue. from the brick building; and the country wagons for the sale of market products were gathered along the avenue for some distance further. In process of time the buildings, both open and closed, were carried along so as to occupy the central part of the avenue to Randolph street, except as crossed by Bates street. In this way the whole of the avenue, along its middle portion, was made a market-place, sometimes called the 'City Hall Market,' and sometimes the 'Central Market.'"

In 1848, it was deemed advisable to formally vacate the middle 50 feet of Michigan Grand avenue, through its entire length, which was done by the action of the com-

mon council and a jury of inquest, under the right of
eminent domain. From that time to the present the city
had occupied and claimed the whole space by title in fee,
and has occupied it for market purposes. In that case
the city was enjoined from interrupting the use of the
market property, or any part of it, or any of the build-
ings used for that purpose, and directed to continue to
maintain the market as such.

This 50-foot strip extends from the Campus Martius to
Randolph street. The brick building facing the Campus
Martius is 50 feet wide, occupying the whole market
space, about two-thirds of the distance to Bates street.
From that point the space is open to and across Bates
street; and from Bates street a one-story, open, frame
building, used for a vegetable market, extends nearly to
Randolph street, occupying the whole 50-foot space.
Sidewalks are carried along the sides of these buildings,
for the accommodation of foot-travelers. On either side
of this strip, extending the whole length thereof, is an
open space in the square, which is used for street pur-
poses, and is and has been for many years a public
thoroughfare. Along the outer sides of this square are
large retail business houses, and extending along in their
front are sidewalks of the usual widths. Outside these
walks are curbstones, at which the pavement of these
thoroughfares commences. These public ways are about
50 feet in width on either side of the market, extending
along the center of this entire space. On the eastern
side of the market is the Fort Wayne & Elmwood Street
Railway track, leaving a space between the track and the
market buildings and grounds of about 17 feet. This
market-place is situate in the center of the heart of the
city, and the thoroughfares on either side are daily trav-
eled by a great number of wagons and other vehicles,
and by people on foot; and the street-cars on the eastern

side are in constant use for public convenience. The smallness of this market-place has necessitated the setting aside of grounds and space for such purposes, and the council have established other market-places; the Cass market, and the Eastern and Western markets, and the Eastern hay-market, all within the city, all paved, and upon which wagons may stand.

On September 25, 1888, and after the opinion was filed in *Attorney General v. City of Detroit, supra,* the council passed an ordinance designating these spaces as public market-places. This additional market space was established with a view to further changes in the regulations of the Central market, as was done by the ordinance amendatory to section 11, chap. 66, above referred to. This ordinance was adopted as soon as the new space was made available for occupancy, and its purpose was to prohibit the sale of produce on the Central market, except from the stalls or stands.

In *Hughes v. Recorder's Court,* 75 Mich. 574 (42 N. W. Rep. 984), the validity of this ordinance came before this Court, and in an opinion by Mr. Justice CAMPBELL it was held that the ordinance prohibited the sale of articles on the principal market of the city, except from stands leased by sellers, and confines farmers and others, with their vehicles, to other markets, where the accommodations are inadequate, and virtually shuts out the latter class of vendors from said market, without giving them any substitute for it, and requires their articles to be sold by the lessees of the stalls, and is therefore void. While this opinion was concurred in by the other members of the Court, yet all the other members expressed their views that the charter of the city of Detroit confers full authority upon the common council to pass and enforce ordinances to prohibit and prevent the incumbering of streets, and to prevent obstructions to public

travel over the streets and public places in the city, by vehicles or otherwise, outside of the market limits.

Section 11 being held void, the council re-enacted it as it was prior to the above amendment, and, for the purpose of rendering the enforcement of sections 11 and 12 easier, added the amendment of August 2, 1889. This section adds no new features to sections 11 and 12, as they stood prior to the amendment of April 5, 1889, which was held void in *Hughes v. Recorder's Court, supra*. These sections formerly read as follows:

" SEC. 11. All farmers and gardeners selling, or offering for sale, from wagons, carts, or other vehicles, within the limits of the city of Detroit, any grain, vegetables, fruits, meats, live calves, sheep, poultry, or other articles of produce, of their own raising, shall occupy and stand with such wagons, carts, or other vehicles, and nowhere else, on the Central market, Cass market, and Eastern and Western hay-markets, in the places established according to the first preceding section, where the market clerk, or other officer in charge of such markets, shall direct.

"SEC. 12. All persons, other than farmers and gardeners, selling, or offering for sale, from wagons, carts, or other vehicles, any meat, vegetables, fish, dressed poultry, butter, live calves, sheep, lambs, or poultry, fruits, flowers, plants, or other articles, shall occupy and stand with their teams, and at no other place, on the Eastern and Western hay-markets, in the places established according to section ten (10) of this ordinance, where the pound-master, or other officer in charge, shall direct. In addition to his other duties, it is hereby made the duty of each pound-master to carry out the provisions of this ordinance in his district."

Counsel for the city contends here that section 11 granted to farmers and gardeners the right to stand with their wagons, for the purpose of selling produce, on any of our public markets, and prohibited them from standing elsewhere, and section 12 granted to persons other than farmers and gardeners the right to stand on the Eastern and Western hay-markets, and prohibited them

from standing elsewhere; that by these sections nobody had the right to stand on any street, with their wagons, while selling, etc., but, in enforcing the ordinances, if the person so standing in the street was a farmer or gardener, the complaint would have to set forth a violation of section 11, and otherwise, of section 12; and that, as the violations were all in the street adjacent to the Central market, and the persons violating the law were largely peddlers, selling the articles they had purchased of the producer or commission merchants, as well as farmers selling their own produce, the addition was made to section 11, so as to avoid the necessity of proving the fact whether the person complained of was a farmer or gardener, or otherwise.

It is contended, further, that farmers and gardeners are not prohibited from selling their produce through the city, or from casually stopping their wagons for that purpose; and our attention is directed to chapter 72 of the Revised Ordinances of 1884, which provides that persons having the proper license may peddle in the streets, but are required to keep their vehicles in motion, except when making a sale, when they are to draw up to the curbstone, and farmers and gardeners, selling their own produce, may peddle without being obliged to pay a license fee. In this contention we think counsel correct. The act sought to be prohibited is the permitting a wagon to stand in the street for the purpose of selling, and with no intention to move it till the produce is sold.

This ordinance is a reasonable restriction upon all classes, to prevent the incumbering or obstruction of the streets of the city, and within the power of the council to adopt. Section 122 of the charter of 1886 gives the common council power—

"To prohibit and prevent incumbering or obstructing of streets, lanes, alleys, cross-walks, sidewalks, and all

public grounds and spaces, with vehicles, animals," etc.

The place where defendant was standing with his wagon was within the space which, as is prescribed in this amendment of section 11, shall be kept clear and unobstructed by this traffic. It is evident that these spaces on either side of the Central market, which have become public thoroughfares, are too narrow to admit of teams, wagons, and other vehicles standing there for the purpose of trade from such vehicles. The market grounds themselves are set apart for the purposes of such trade.

It does not follow that because the city authorities are prohibited from discontinuing the city market, and are compelled to keep and maintain it there, and that the space is too small to accommodate all who desire to sell their products, that the city authorities cannot keep the streets, and other public places surrounding it, clear and unobstructed for the convenience of public travel. It is evident that on certain hours of the day these public highways are crowded with teams and wagons, by persons who are desirous of selling, and who cannot be accommodated within the market space, and Campus Martius and Cadillac square, as well as Bates, Randolph, and other streets within the 500-foot limit, are constantly overrun with these vehicles.

These markets are established for the convenience of the public, who purchase such products, and not alone for the convenience of the parties who desire to sell. The traveling public have the right of passage by wagons and other vehicles upon and along these highways, and, under the provisions of the charter above quoted, it became the duty of the council to provide a way for the public to pass, and to remove all obstructions to the way of travel. This is a reasonable regulation.

The defendant was properly convicted, and the judgment must be affirmed.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred with LONG, J.

CAMPBELL, J., *(dissenting)*. I do not care to go into any extended argument on a matter in which I am unable to agree with my brethren, and shall, as briefly as I can, indicate my own view on the main question involved.

Until the recent ordinance, I am very sure it was always supposed that an out of doors market is chiefly valuable for the facilities it furnishes to producers to come together at one common resort, to sell their produce. In my judgment, this ordinance is not only oppressive, but practically a fraud, favoring special interests. According to the record, it appears that the market space in the middle of Cadillac square is built over for the greater part of its extent, and that the only open space entirely within it is ridiculously small to accommodate the country wagons, being no larger than an average city lot. Until recently, as appeared in the *Henkel Case*, the city found no difficulty in giving space for wagons over a large extent of the square for some hours of the day; and we held such use of the street of which it consists was proper, and to be expected, about a market. In all parts of the world, and in cities much more considerable than Detroit, the temporary use of adjacent streets has always been deemed an essential part of the surroundings of a market. The law of markets, as exemplified in the common-law precedents, shows this very clearly. One of the prominent reasons now urged, although what part it plays in the record I do not understand, is the purpose of the city to allow another street railway to occupy the space which without it would be of entire convenience for market purposes. On what pretext it can be held that such a scheme can be allowed to crowd out the market is not at all clear to my mind. This ordinance

further provides a rule of exclusion from Cadillac square, and other named streets, to a distance of 500 feet from the market space, for no conceivable reason of relieving the pressure round the market, as it covers a range entirely beyond reach of it, and appears to have no definite object, beyond isolating the market from traffic, and rendering it insignificant. That this ordinance entirely changes the character of this market is palpable. That the asserted necessity is one created by the city itself, and extremely well adapted to destroy the market, is equally plain. Nor do I think the location of the supplementary markets elsewhere is much more than colorable. The record certainly does not show that it is. It seems to me that our action, if we sustain this prosecution, allows to be done by evasion what is just as effectual for mischief, as a bolder and more direct refusal to respect the legal and honest obligations of the city.

I think the ordinance should not be sustained, and that the conviction was wrong.