No. 34,743

THE STATE OF KANSAS; ex rel. JAY S. PARKER, Attorney General, *Plaintiff,* v. THE CITY OF KANSAS CITY; DON C. McCOMBS, as Mayor-Commissioner; FRANCIS BLAKE, as Commissioner of Boulevards, Parks and Streets, and GEORGE T. DARBY, as Commissioner of Finance, Health and Public Property, *Defendants.*

(98 P. 2d 101)

Opinion filed January 27, 1940.

*Jay S. Parker,* attorney general, and *A. B. Mitchell,* assistant attorney general, for the plaintiff.

*Alton H. Skinner,* city attorney, *Joseph A. Lynch,* deputy city attorney, *Blake A. Williamson* and *Donald H. Corson,* all of Kansas City, for the defendants.

The opinion of the court was delivered by

DAWSON, C. J.: The state, on the relation of the attorney general, and the city of Kansas City invoke our original jurisdiction in quo warranto to determine the legality of certain arrangements which the city and its governing officials propose to make with prospective tenants of the newly completed food terminal market. More precisely put, the city wants an authoritative decision on the question whether it may expend some portion of the rental income of the market to aid a number of wholesale commission merchants who must sustain certain extraordinary expenses and depreciation losses in order to enter into leasing contracts for large space units in the market.

The pleadings allege that the construction of the Kansas City Food Terminal Market is the culmination of years of effort on the part of the city to improve and put to use a tract of land donated in pre-statehood times to the town of Wyandotte, now Kansas City, for a public wharf on the west bank of the Missouri river and north of its confluence with the Kaw. Preceding chapters in the progress of this civic undertaking are recorded in our reports. (*Kansas City v. Wyandotte County,* 117 Kan. 141, 230 Pac. 79; *State, ex rel., v. Kansas City,* 140 Kan. 471, 37 P. 2d 18; *Robertson v. Kansas City,* 143 Kan. 726, 56 P. 2d 1032; *State, ex rel., v. Kansas City,* 149 Kan. 252, 86 P. 2d 476.) Other cases incidentally involving the wharf property and its accretions were *Stark v. Meriwether,* 98 Kan. 10, 157 Pac. 438; Id., 99 Kan. 650, 163 Pac. 152; *State of Kansas v. Meriwether,* 171 Fed. 39; *Missouri v. Kansas,* 213 U. S. 78, 53 L. Ed. 706.

The present action has arisen out of the passage of a resolution by the city government of Kansas City which reads:

"RESOLUTION No. 11275

"WHEREAS, The Board of City Commissioners of the city of Kansas City, Kansas, by ordinance No. 30304, passed on the 6th day of December, 1938, approved by the mayor on December 6, 1938, and published in the official paper of Kansas City, Kansas, on December 8, 1938, adopted a uniform lease form for the leasing of wholesale units in the Kansas City Food Terminal, which said form provided, among other things, for a rental of fifty dollars ($50) per month per unit for the first three months, and one hundred fifty dollars ($150) per month per unit for each additional month thereafter; and

"WHEREAS, In connection with negotiations with prospective lessees for use of space in the new Kansas City Food Terminal, the city has found that certain costs would be incurred by some prospective tenants, due to rental obligations on present places of business and costs due to abandonment of equipment and facilities now located in, and the good will of said established place of business, and said prospective tenants, as a condition precedent to the acceptance of said leases, have asked the city to absorb a part of said costs; and

"WHEREAS, The city, after consideration, have found that in the initiation of the Kansas City Food Terminal project desirable tenants have engagements and existing facilities that must be taken into consideration in securing the coöperation of such persons and the occupation by them of the facilities in the new terminal, and that it is the prudent and necessary thing to do in initiating the project and to secure the full coöperation of the dealer tenants necessary to obtain the fullest possible occupancy of the facilities: Now, therefore,

"Be it resolved . . . That the city of Kansas City, Kansas, proceed promptly to negotiate with each prospective lessee to determine upon the character and amount of such costs to be established by sworn statements of said prospective tenants and upon agreement with respect thereto to enter into leases with them for facilities in the Kansas City Food Terminal on such terms and conditions as to cash payments to said tenants or credits on future rentals, or both, as the board of city commissioners of the city of Kansas City, Kansas, may determine to be necessary and proper expenses in connection with the establishment and operation of said Kansas City Food Terminal.

"Be it further resolved, That said board of city commissioners hereby request the attorney general of the state of Kansas to forthwith proceed in the nature of a quo warranto in the name of the state and against the city and its governing body to determine whether or not the city and its commissioners, in its proprietary capacity, have authority to pay such sums as are necessary in the discretion and sound judgment of the board of city commissioners to carry out, in the discretion of said board, such policies and transactions as may be to the best interest of said city in securing tenants for said Kansas City Food Terminal.

"Said attorney general is also requested to raise any and all other questions as he shall deem just and proper in the premises.

"Adopted by the board of commissioners this 16th day of December, 1939."

Accordingly the attorney general's petition alleges at length all the pertinent facts—the dedication of certain riparian lands at the junction of the Missouri and Kaw rivers for a public wharf, its improvement by the city, the construction of levees to protect it from floods, the construction of a grain elevator terminal dock and wharf, the construction of a mooring wharf, and the construction of a wholesale terminal fruit and vegetable market, and other improvements—the cost of which has been met by an issue of $3,000,000 revenue bonds and by a generous grant of funds from the federal government. Within the last few years the total expenditure of government funds and borrowed money on these improvements approximates $6,000,000.

The state alleges that the defendants are without authority to do what is now proposed in the resolution set out above—that no part of the rental income already collected can be thus expended, nor can abatements of prospective rents or credits thereon be extended to prospective tenants as an aid or inducement for them to become lessees of units of the market.

Attached to plaintiff's petition are copies of city ordinances under which bonds to the amount of $3,000,000 have been issued payable out of the anticipated rental income of the city's public levee and this new food terminal market. These bonds contain lengthy recitals as to the purposes of their issue, and also recite that—

"This bond and the interest hereon are payable solely from the money and revenue received by said city from the fees charged and rental received for the use of the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the proceeds, in whole or in part, of the revenue bonds of said city, issued or to be issued as aforesaid, and not from any other fund or source. This bond shall not be or constitute a general obligation of said city of Kansas City, Kansas."

Defendants' answer raises no issue of fact, but only pertinent issues of law. Defendants assert that they have lawful authority to do what is reasonable and necessary to insure the success of the market; that they are immediately confronted with an administrative problem of first importance, which is that of procuring responsible tenants to lease and occupy some thirteen of the largest rental units in the market; that without such tenancies and the rental income to be derived therefrom the financial objective of providing for the payment of the bonded debt incurred in constructing the market and its related facilities, as contemplated by the statute and by the defendant city, cannot be accomplished. Defendants further

contend that what is proposed in resolution No. 11275 is an exercise of sound business sagacity and discretion on the part of defendants who are exclusively charged with the onerous responsibilities involved in this important civic undertaking.

Although most of the facilities of the terminal market are now completed and ready for occupancy, it is not yet possible to determine with accuracy what the income of the market and its related facilities will be. Expert accountants have calculated that it should produce a total gross income of $7,542,660 by the time the bond issue falls due. Out of that gross income the interest on that bond issue and the ordinary and contingent expenses of operating and maintaining the market must be met.

It is pleaded in defendants' answer and explained in their brief that there are some thirteen responsible commission firms, "key men," in the wholesale food, fruit and vegetable business in or near Kansas City, whom the defendants are particularly desirous of inducing to become tenants of the market. In their answer, defendants allege—

"That said firms have offered to transfer their business to the Kansas City Food Terminal for the sum of $111,850 cash and $30,700 credits on rent, or a total amount in cash and rent of $142,550, which will net to said city from said thirteen firms alone, over the period of time that they offer for the initial period to lease, of $62,350. These firms will bring to the Kansas City Food Terminal the added benefit that will accrue from the attendance of their established customers upon the market, and because of the fact that they transact a total carload business averaging 7,500 cars a year, will give added prestige to the market and attract other tenants to such quarters as remain unleased after they move in.

"That these thirteen firms control and now have about fifty percent, or more, of the unload business at Kansas City, and in addition to the quarters above referred to, said market terminal includes twenty-four other units now occupied and twenty units not yet completed which are being leased for allied food lines, wholesale cheese, meats, butter, poultry, eggs, fish, etc., seventy-five office rooms for brokers, seventy-two of which are now leased, a bank building, restaurant and retail stores for feed, drugs and farmers' supplies under construction, also 428 farmers' stalls, together with a cold-storage plant, grain elevator, terminal dock, railroad tracks, a public wharf on the river and filling station.

"Based on the facilities being fully occupied over the thirty-year period for which the bonds have been issued, the aggregate total rentals at rates prescribed by the governing body will amount to $7,542,660 and the total expense of procuring these firms amounts to 1.9 percent of the gross rentals."

Plaintiff's motion for judgment concedes the accuracy of these alleged facts.

Counsel for the parties have sought assiduously to assist the court to reach a correct decision in this cause, of the importance of which to the city we are fully aware, as well as its importance to the bondholders, and likewise to the federal government whose grants in aid have brought this great municipal enterprise into existence. Various decisions of this court, mostly those reaching back to pioneer times in this state, are cited. (*Whetstone v. Ottawa University*, 13 Kan. 320; *Town Co. v. Russell*, 46 Kan. 382, 26 Pac. 715; *Fulton v. Land Co.*, 47 Kan. 621, 28 Pac. 720; *Town Co. v. Lincoln*, 56 Kan. 145, 42 Pac. 706.) These show how liberally this court was wont to deal with challenged exercises of corporate power by the early town companies to induce settlers to take up their abodes in the prospective cities, and to establish businesses therein, and to found colleges and other desirable institutions thereabout. However, in the case at bar it seems rather clear that the proper conclusion to be reached does not turn on a critical examination of analogous cases, but rather upon a study of the pertinent statute and the pertinent circumstances under which the defendants assume to act.

Our general statutes contain various provisions authorizing the cities of this state to establish and maintain a public market and to provide equipment therefor. (G. S. 1935, 12-1301 *et seq.*, 13-402, 13-1060 *et seq.*) But these provisions have little bearing on our instant case further than to note that the establishment, maintenance and regulation of a municipal public market is no new thing. In *Attorney General v. Detroit*, 71 Mich. 92, 100, 102, 103, 38 N. W. 714, it was said:

"Markets are as old as civilization, and public market places have in many countries been identified with the most important events in their history. . . .

"There are few cities in the United States that do not owe much of their business prosperity, and much of their enterprise, to the energy and thrift of citizens who began and have sometimes kept up their active career in the public markets. . . .

"There is not very much American law on the subject of markets. Their general conditions have so generally remained unchanged that the old usages have been followed without controversy. There are few, if any, popular institutions so universally retained, and few that have served a better purpose. The law, as found in the standard textbooks and digests of the older authorities, stands practically unaltered in any feature of public utility. See Bac. Abr. 'Fairs and Markets'; Com. Dig. 'Markets'; 1 Bl. Comm. 274; 3 Bl. Comm. 218; 2 Co. Inst. 220, c 31; *Townend v. Woodruff*, 5 Exch. 506; Toml. Law Dict. 'Market'; *Rex v. Burdett*, 1 Ld. Raym. 149."

The basic statute which confers and limits the powers of the de-

fendant city and its governing officials touching the subject matter of present concern is Laws 1933 (Special Session), ch. 43, as amended by Laws 1937, ch. 135. (G. S. 1935, 13-1238 to 13-1243, 13-1245, and G. S. 1937 Supp. 13-1238, 13-1244.)

By this statute any city of 115,000 population or more (like Kansas City) is authorized to improve, construct or repair its public levees, docks, wharfs, river terminals, grain elevator terminal docks, and such storage, railroad and other facilities as will provide convenient access to adjacent navigable water transportation. To provide the wherewithal to pay for these improvements, the city is authorized to sell revenue bonds payable exclusively out of the income of the public levee and its related facilities and improvements. The statute contemplates that the revenues out of which the bonds are to be paid are to be derived out of the rates and charges to be exacted by the city for the use of the services and facilities as outlined above—"which rates and charges so fixed shall be sufficient *to pay all expenses of the city in connection therewith and cover the cost of operation* and repairs, pay all interest charges upon all indebtedness created for the purpose of improving, constructing, reconstructing, repairing or improving of such public levee and the improvements and facilities thereon for which such revenue bonds were issued to so improve, construct, reconstruct or repair and to provide a sinking fund sufficient to pay off such indebtedness at maturity." (G. S. 1935, 13-1242.) (Italics ours.)

Another section of the statute reads:

"The governing body of such city, *is hereby empowered and authorized to enter into an agreement* in writing *with any person, firm or corporation to erect* and construct on its public levee, improvements and facilities authorized and mentioned in this act and lease the same for a term of not to exceed ninety-nine years *for such rental and upon such conditions as in the judgment of said governing body will be to the best interest of such city,* provided the rent fixed by any such agreement and lease shall be sufficient to liquidate and pay all expenses of the city connected therewith and the principal and interest of all revenue bonds issued or to be issued to pay the full cost of such improvements and facilities so leased." (G. S. 1935, 13-1243.) (Italics ours.)

Note that the statute says the governing body of the city may lease the market facilities upon such terms and conditions "as in the judgment of said governing body will be to the best interests of the city." Under such a broad grant of statutory power, it would appear that what the city and its governing officials undertake to

do would have to transcend all reasonable bounds of official discretion before a court would be justified in interfering.

Clearly the statute implies that it is the duty of defendants to make the market a success. To effect that object, it gives few explicit directions. . In only two matters does the statute particularize, (first) that neither the cost of constructing the market nor any of its incidents or concerns shall ever become a charge upon the city's general revenue fund nor directly or indirectly a burden on the city's taxpayers, and (second) that the city shall fix rates and charges for the use of the market at such figures as will pay the principal and interest of the bonded debt, *and meet all pertinent expenses of the market.* The rates and charges may be higher than this requisite minimum. Certainly the statute does not contemplate that when the bonded debt is liquidated the rates and charges must be reduced accordingly. The broad statutory mandate will continue to govern; the governing body will continue to exercise its discretion as to what "will be for the best interest of the city."

The statute does not say that the rates and charges for every booth, stall, and rental unit shall be identical. Varying factors of size, location, and other circumstances would make such uniformity impracticable. On such matters the discretion vested in the governing body of the city is necessarily quite broad. If this public market had been called into existence by a corporation altogether separate from the city, but for precisely the same purposes (as was done when the legislature created a separate corporation for dealing with problems of flood control rather than impose such additional duties on the governing body of Kansas City or on the board of county commissioners), and if its board of directors should find their corporate enterprise stalled at its inception for want of tenants and had deemed it expedient and necessary to expend certain of their corporate funds to aid and induce desirable tenants to enter into leasing contracts for space units in the market, surely their power to do so would pass unchallenged. Confronted with this precise problem, why may not the defendants do the like in the actual case before us?

It may be suggested that if defendants have such broad discretionary authority they or their successors in office may allow unfair discrimination or abatements of rent between tenants, or exercise favoritism in other respects. That, of course, is a possibility, but if the hands of public officials are to be *judicially* tied on that account,

where the legislature itself has not seen fit to tie them, any official board or officer could be stopped by judicial interference. However, Kansas government is founded on the assumption that public officers and boards, great and small, will exercise their express and implied powers fairly and honestly. In *Manufacturing Co. v. Hayes*, 98 Kan. 269, 157 Pac. 1169, it was said:

"We believe the rule to be fundamental, not only in Kansas but throughout all states and countries where either the common or civil law prevails, that the acts of any official, not alone those of a magistrate, but of any official of any department of government, when within the general scope of his powers are presumed to have been regularly and lawfully done. This rule was crystallized into a maxim before law and rules of law were written in the English tongue. See the variations of the ancient maxim, *'Omnia rite esse acta praesumuntur,'* meaning all official acts are presumed to have been rightfully done, in 2 Bouvier's Law Dictionary. The burden is on the party who assails their regularity." (p. 270.)

It is quite true, as this court has often said, that public funds can only be disbursed as sanctioned by statute. And ordinarily such statutes specify not only how such funds may be expended but how they shall be raised, and how *much* shall be raised. Ordinarily the lawmakers' chief solicitude is for the taxpayers and for the use of the public property constructed with the taxpayers' money. We do not regard such cases as *State, ex rel., v. City of Hiawatha,* 127 Kan. 183, 272 Pac. 113 and citations, or *State, ex rel., v. City of Lawrence,* 150 Kan. 353, 92 P. 2d 31, as controlling or helpful. In the Hiawatha case it was too clear for cavil that the city's memorial auditorium erected at the expense of the taxpayers was never intended to be used as a business enterprise. So, too, in the Lawrence case, the city not only lacked statutory authority to lease the armory it planned to build, but other pertinent statutes could not be harmonized with the city's project challenged by the state. Here *per contra*, the terminal market and all the vast and costly improvements pertaining to it have been constructed in the hope and expectation of the legislature, the city, and the federal government, that they will eventuate as a permanently successful municipal enterprise.

This court has frequently recognized that there are two distinct phases of corporate capacity vested in the cities of this state—their strictly governmental capacity, in which they are to be concerned with the health, safety and morals of the public as direct agencies of the state, and their quasi private or proprietary capacity, in which

their corporate concerns are left largely to the city's own determination. Familiar instances of the latter are the adventures of a city into municipal ownership of public utilities, such as water, gas and electric power plants. In the exercise of their proprietary prerogatives this court has said that the governing officials of a city may lawfully exercise their discretion and judgment in much the same way as is done by the directors of a private corporation or by the proprietor of a private business. Thus in *State v. Water Co.*, 61 Kan. 547, 561, 60 Pac. 337, the validity of certain hydrant rental contracts between the city of Topeka and the privately owned corporate utility, The Topeka Water Company, was challenged. This court said:

"In the making of said contracts, evidenced by ordinances, the city was not exercising legislative or governmental powers, but quasi private power conferred by law, and in such matters it could exercise its business affairs governed by the same rules as apply to an individual or a private corporation. (1 Dill. Mun. Corp. § 27, and cases cited; *Illinois Trust & Sav. Bank v. City of Arkansas City*, 22 C. C. A. 171, 76 Fed. 271, 34 L. R. A. 518.)"

The same rule of law was reiterated in *Hubbel v. South Hutchinson*, 64 Kan. 645, 648, 68 Pac. 52; *Water Co. v. Cherryvale*, 65 Kan. 219, 228, 69 Pac. 176; *State, ex rel., v. City of Coffeyville*, 138 Kan. 909, 28 P. 2d 1032. See, also, *Capital Gas & Electric Co. v. Boynton*, 137 Kan. 717, 22 P. 2d 958, and cases cited therein; *Kansas Gas & Electric Co. v. City of McPherson*, 146 Kan. 614, 72 P. 2d 985.

In *Child v. Board of Commrs. of Newark*, 8 N. J. Misc. 597, 151 Atl. 203, a taxpayer brought suit to challenge the city's authority to lease its public market for a term of fifty years at an aggregate rental of $20,000,000 and to pay a commission of $200,000 to the firm of real-estate dealers who negotiated the lease. In refusing to interfere, the supreme court of New Jersey said:

"The lease is highly advantageous to the city. It provides a large revenue and relieves the city of heavy maintenance charges. The value of the brokers' services is not questioned nor the reasonableness of their commissions. The validity of the action of the city is challenged on the ground that it may not employ brokers, and further that the ordinance is invalid. . . .

"It, therefore, seems that where a municipality has the power to lease lands it has the power to employ the necessary real-estate brokers. That the city acted wisely, and that the brokers secured an excellent result is not questioned. Land which had caused a loss to the city was converted into a large source of revenue. The services rendered by the brokers were strikingly similar to those rendered by architects who take from their store of knowledge a design for a beautiful and useful building and produce, by reason of their skill and initiative, a productive and useful property. . . .

"The brokerage commissions are to be paid out of the rents as they are paid in the first six annual installments. They are payable out of the rentals and not otherwise, and are hence not to be met from city funds." (pp. 598, 599.)

In *City of Oakland v. Williams*, 206 Cal. 315, 274 Pac. 328, the board of harbor commissioners had contracted with a commission firm, Rosenberg Bros. & Co., engaged on a large scale in packing, processing and shipping dried fruits to domestic and foreign markets, by the terms of which the board was to build a $400,000 warehouse on a seven-acre tract of the state's tidal lands held in trust by the city of Oakland. The parties concerned arranged a lawsuit to test its validity. In the instructive opinion of the California supreme court it was said:

"The importance of the development of the natural harbor and seaport advantages which the city of Oakland, situated on the easterly side of the San Francisco Bay, with direct and spacious connection with the Pacific Ocean, offers to the immense agricultural and commercial districts of northern and central California, is not questioned. It is admitted that said city and port is the terminus of three transcontinental railroads and one intrastate railroad. In addition to these transportation lines, an immense volume of agricultural, orchard, dairy and general farm and ranch products of the state and factory products from without, is also carried into said city by many public transportation companies and by private conveyances, destined for foreign shipment, but because of the lack of reasonable harbor development and improvements vessels of reasonable tonnage were unable to enter said harbor. It is alleged, and not denied, that the declared policy on the part of the city of Oakland, which had been the subject of long public discussion, to adopt a comprehensive and concrete program of development has attracted and is still attracting manufacturers in all industrial lines to establish large factories and plants in said city and territory adjacent thereto, because of its favorable situs for the transportation of commerce to domestic and foreign ports and countries by both land and sea. Responding to this growing demand, the city of Oakland submitted the proposition of issuing bonds in the amount of $9,960,000 to be known as the Oakland harbor improvement bonds, to the electors of said city, which issue was duly approved May 18, 1926.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"The warehouse, now in course of completion pursuant to and under the lease contract made by said board with Rosenberg Bros. & Co., is built upon reclaimed tide and submerged lands which constitute a portion of the western waterfront of said city,  .  .  .

"It is not claimed by intervenor that there was not then or that there was not at any time subsequent remaining sufficient unexpended and unapplied funds of said bond issue to pay the estimated expense of said lease contract or that the proceedings adopted by said city are in any way faulty,  .  .  .

"The board, as a preliminary requisite, having found that it was necessary and convenient for the promotion and accommodation of shipping and commerce that said warehouse building be erected pursuant to the plan of harbor

development adopted by it, and that it was consistent with the requirements of commerce and navigation that it be leased to a person or corporation shipping large cargoes of products and merchandise to foreign as well as domestic ports, accepted the bid of $34,598, annual rental, offered by Rosenberg Bros. & Co., a corporation, pursuant to said published notice of intention to lease said premises and awarded the lease to said corporation, . . .

"Intervenor assails certain provisions of the lease and seems to see in them a covert design on the part of the parties thereto to promote the private interests of Rosenberg Bros. & Co. rather than a purpose to aid the welfare of the harbor project. We have examined the provisions of the lease and it appears upon its face to be a fair attempt to execute the trust imposed upon the board by the bond issue proposition and the charter amendment. The fact that certain provisions of the lease by which the parties make an effort to provide for a fair adjustment in case of failure to comply with certain covenants in the event that fortuitous circumstances should prevent a compliance therewith may also tend to create in the mind of the lessee a temptation to resort to equivocal conduct in an effort to gain an unfair advantage is not sufficient ground to support the conclusion that such a result was contemplated by the lessor or that the lessee would be influenced thereby. The lease appears to be reasonable and no difficulties will be encountered if the parties thereto are disposed to interpret it in the light of the circumstances in which it was executed and the purposes which both the lessor and lessee covenanted to promote. It is to be presumed that they will so act.

"The questions of the necessity for the improvements and the adoption of the method by which they will be accomplished are matters resting in the judgment of the governing body, and courts will not interfere with the exercise of its judgment unless it appears that its proposed plans are not only not the best that might be adopted, but that they are so inadequate and impracticable as to inevitably result in a waste of public funds. In other words, the judgment of the board as to the necessity for the construction of the building and the methods employed for its construction will not be disturbed except in cases where the exercise of judgment or discretion is shown to have been unquestionably abused." (pp. 319, 321, 323, 325, 326.)

Coming to a conclusion in favor of city, the supreme court said:

"Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. . . .

" 'With the wisdom of such legislation, and the soundness of the economic policy involved, we are not concerned. Whether it will result in ultimate good or harm, it is not within our province to inquire.' " (p. 333.)

In *Wichita Gas Co. v. Public Service Comm.*, 126 Kan. 220, 268 Pac. 111, this court affirmed a judgment of the district court which forbade the public service commission, notwithstanding its broad supervisory powers over the affairs of public utilities, to disallow an

expenditure of $66,000 expended by the gas company to get new business. In discussing this case we said:

"The evidence was, the company was faced with an alarming decrease in consumption of gas. The witnesses for the company and for the commission agreed financial success of the company depended on increasing consumption of gas. The new business expense was incurred in putting into effect a plan for increasing gas consumption which . . . has . . . been adopted by many public utilities. *Fletcher* thought the expenditure should be spread over a period of ten years. The commission now suggests a shorter period. The referee found the situation fairly indicated the expense would be a normal expense each year for several years. The commission is not the company's business manager. The company has a business manager of its own, who must be allowed good-faith exercise of judgment, discretion, and initiative."

See, also, *Green v. Frazier*, 253 U. S. 233, 240, 64 L. Ed. 878.

Time and space forbid the further elaboration of this interesting theme. The court holds that the matters proposed in the city's resolution No. 11275 are the exclusive concern of the defendant city and its governing body, and should not be halted by judicial interference. Judgment should therefore be entered in favor of defendants. It is so ordered.

Harvey, J., dissents.