THE CHERRYVALE WATER COMPANY v. THE CITY OF CHERRYVALE.

No. 12,837. (69 Pac. 176.)

SYLLABUS BY THE COURT.

CITIES— *Contract with Water-works Company—Election to Purchase—Estoppel—Rescission of Election.* By ordinance passed in 1885, a city of the second class granted to a water company, for the term of twenty-one years, "the privilege to construct, operate and maintain a system of water-works in the corporate limits of the city, for supplying the city and citizens with water for domestic and sanitary purposes, as well as for the better protection of the city against disaster from fire." The city, by the terms of the ordinance, rented forty-five fire hydrants at an annual rental of $2700, and reserved the right to rent more. The city reserved the option to buy the works at the expiration of ten years and, failing then, at the expiration of every five years thereafter, upon giving ninety days' notice, the purchase-price to be determined by arbitrators mutually chosen. Shortly before the expiration of fifteen years the city elected to buy the plant and served notice on the company to that effect. After the expiration of the ninety days' notice, a lake which furnished the water-supply went dry and so remained for about six weeks. The city then notified the water company that it rescinded its election to buy. In an action brought by the city on August 4, 1900, to forfeit the rights of the water company to use the streets and alleys, and to annul the ordinance granting it a franchise, for the reason that it

had failed to furnish wholesome water for domestic and sanitary purposes, it appeared that the city had recognized the lake as a source of supply by two ordinances, passed in 1889 and 1895, and had paid hydrant rentals in full up to January 1, 1900. *Held*, That after the election to purchase, and the recognition of the lake by ordinances as a source of supply, and the payment of hydrant rentals, the city could not complain of the bad condition of the water before the option to buy was accepted by it; and, *held* further, that the election of the city to take the water-works constituted a contract to purchase capable of specific performance in equity, and that the city could not rescind its election by reason of the failure of the water-supply subsequent to the notice given the water company whereby it had elected to take the plant; and that the city, not having done equity on its part, cannot recover.

Error from Montgomery district court; THOS. J. FLANNELLY, judge. Opinion filed June 7, 1902. *In banc.* Reversed.

### STATEMENT.

ON the 25th day of June, 1885, the city of Cherryvale, a city of the second class, by ordinance No. 13, duly passed, entered into a contract in which it granted to J. A. O'Neil, his associates, successors, or assigns, for the term of twenty-one years, the right to lay pipes in all of the city streets and alleys, and granted ''the privilege to construct, operate and maintain a system of water-works in the corporate limits of the city, for supplying the city and citizens with water for domestic and sanitary purposes, as well as for the better protection of the city against disaster from fire.''

It is provided in the ordinance that the city rent forty-five double-discharge hydrants, during the life of the contract, at an annual rental of $2700, payable semiannually, with legal interest after maturity, such hydrants to be located at places designated by the mayor and council. The city also reserved the right

to rent additional hydrants at the rate of fifty dollars per annum.

Sections 9 and 10 of the ordinance read:

"SEC. 9. That the city shall have the right to purchase the works at the expiration of ten years, and failing to purchase the works at the expiration of ten years, then every five years thereafter, at the appraised valuation of three disinterested parties, said appraisers to be selected in the following manner, namely: The city selecting one, the said J. A. O'Neil, his successors or assigns, selecting one, and the two chosen to select the third. When the three shall be chosen they shall be duly sworn, and they shall proceed to declare the valuation of said franchise works and choses in action by examining not exceeding three experts on behalf of each party, and when they or a majority of them have declared the valuation in writing, the city shall pay the same within three months thereafter, and in case there shall not be hydrant rental existing at the time of purchase, then the number of hydrants erected shall be taken into consideration at the rates provided for in sections 5 and 6, and the city in this purchase shall assume all obligations of the water company, the lawful quittance for which shall be secured by the said J. A. O'Neil or assigns as a part payment of the declared valuation, and said O'Neil or assigns shall accept obligations of the city of Cherryvale, legally issued at legal rates of interest, not exceeding ten annual payments for the balance due upon the declared valuation, after deducting the obligations of the water company.

"SEC. 10. That the city shall give three months' notice in writing of their intention to purchase."

By section 12 of the ordinance it is provided:

"In case of default or failure in operating said works or supplying water as herein provided, the city may take temporary possession of said works and appurtenances and operate the same until insured that the same will be effectually operated by the owners; any expense incurred by the city in so doing may be

retained by the city out of the sums that may be due or become due to said O'Neil, his successors or assigns, from the city as provided herein."

In section 15, it is stipulated that the ordinance shall be a contract between the city and the grantees of the franchise and "binding upon all parties with equal force and effect." The terms and conditions of the ordinance were accepted by J. A. O'Neil, in writing, on June 25, 1885, and the acceptance filed with the city clerk.

Soon after the passage of the ordinance, water-works were constructed, pipes laid, and hydrants provided, either by O'Neil or the Cherryvale Water and Manufacturing Company, his successor and assignee. The said company operated the water-works until the 1st day of July, 1892, when the city took possession and operated the same until the 7th day of October, 1892, on which date the works were turned over to John M. Courtney, receiver, appointed by the court in foreclosure proceedings against the water-works company. Under a decree in the foreclosure suit, brought by the bondholders against the water-works company, the plant was sold to a trustee of the bondholders, and a reorganization effected, resulting in the incorporation of the plaintiff in error, which has succeeded to all the rights of O'Neil under the contract and ordinance.

When the water-works were first constructed the source of supply consisted of wells near the pumping station. Within a short time thereafter these wells proved inadequate, and the company connected the wells by pipes to a lake called Lake Tanko, containing an area of about thirty acres and which ordinarily contained from five to nine feet of water. The water in this lake was supplied by the natural drainage of

the surrounding country.   No natural watercourses run into it.   The lake was the recognized source of water-supply, as appears from an ordinance approved July 1, 1889, entitled "An ordinance in relation to dead animals, the protection of the water-supply," etc., in section 2 of which it was enacted that it should be unlawful for any person to deposit any rubbish or decayed vegetation or other filth near or in the lake south of the city, known as Lake Tanko, or for any person to bathe therein.   After this, and on June 24, 1895, another ordinance of like purport was passed, in which this lake was referred to as the source of supply of water for the inhabitants of the city.

On July 5, 1897, an ordinance was passed and approved entitled "An ordinance relating to the amount and payment of hydrant rental due the Cherryvale Water Company for the years 1896, 1897, and 1898," section 1 of which is in part as follows:

"WHEREAS, The system of water-works provided for in said ordinance is now owned and operated by the Cherryvale Water Company, a corporation organized under the laws of the state of Kansas, and the hydrant rental, as provided in said ordinance No. 13, for 1896 and the first half of the year 1897, is now wholly unpaid; and whereas, the financial condition of the city is such as to make the payment of said hydrant rental for the years 1896, 1897, and 1898 burdensome: now, for the purpose of enabling the city to pay the rentals to said water company for the said years of 1896, 1897, and 1898, the hydrant rental for the forty-six hydrants now used by said city, under said ordinance No. 13, is hereby fixed at $2000 per annum for said three years, 1896, 1897, and 1898; said rental to be paid as follows."

Sections 2 and 3 read as follows:

"SEC. 2.   That in consideration of the Cherryvale Water Company accepting this ordinance, and for

said three years receiving the reduced rental mentioned in section 1 of this ordinance, the city hereby agrees to issue said warrants promptly when issuable, according to section 1, and to refrain from any annoyance of said water company, or any attempt to further reduce the amount of rentals due said company, without good and sufficient cause.

"Sec. 3. That this ordinance and its acceptance by the Cherryvale Water Company shall not be deemed or held to waive, or construed so as to affect or limit, any of the rights of the city or the Cherryvale Water Company under said ordinance No. 13, excepting as to the amount and payment of rental for hydrants for said three years 1896, 1897, and 1898."

The city paid hydrant rental in full up to January 1, 1900.

On February 9, 1900, the city elected to buy the plant of the water company, and on that day served upon the superintendent of the water company the following notice:

*"John Courtney, superintendent the Cherryvale Water Company, Cherryvale, Kan. :*

"You are hereby notified, in your official capacity as superintendent, that the city of Cherryvale, Kan., has elected and determined to purchase of the Cherryvale Water Company, of Cherryvale, Kan., the entire plant and equipage owned and controlled by it, the Cherryvale Water Company, of Cherryvale, Kan.

"The city of Cherryvale, Kan., elects to proceed in purchasing the Cherryvale Water Company's plant, owned by the Cherryvale Water Company, under its franchise which is shown under the revised ordinances as ordinance No. 13 (thirteen), sections 9 and 10.

"That there may be no misunderstanding between the Cherryvale Water Company and the city of Cherryvale, Kan., sections 9 and 10 are hereby set forth in full, with the intention of making said election above referred to as part and parcel of the notice herein

contained.  [Here are set out in full sections 9 and 10 of the ordinance, found above.]

"Done at Cherryvale, Kan., this 9th day of February, 1900.

[CITY SEAL.]          REVILO NEWTON, *Mayor*.
"Attest: S. J. Howard, *City Clerk*."

After this, and on May 14 following, the lake from which the water-supply was taken went dry, and so remained until June 29, 1900, during which time the plaintiff in error was unable to furnish a supply of water for domestic purposes, but kept its pipes full of water, and steam up in its boilers for the extinguishment of fires, getting its supply for that purpose from wells.

On June 5, 1900, a resolution was passed by the mayor and council of the city of Cherryvale rescinding the notice to purchase theretofore given to the water company, and demanding that the water company furnish at once (within ten days) a supply of water of good quality for public and individual use. The resolution is as follows:

"COUNCIL CHAMBERS OF THE CITY OF CHERRYVALE, KAN.

"RESOLUTION.

"WHEREAS, By section 9 of the ordinance entitled 'An ordinance to provide for the construction of a system of water-works for the city of Cherryvale for domestic, sanitary and other purposes,' the said city has the right to purchase the works at the expiration of ten (10) years from the passage of said ordinance, which was approved June 25, 1885, and failing to purchase the works at the expiration of ten years from said time, said right accrues to said city every five (5) years thereafter; and

"WHEREAS, On June 25, 1900, it again has the right to purchase said water-works should it desire to do so; and

15—65 KAN.

"WHEREAS, On February 9, 1900, in an attempt, to comply with the terms of said section 9, a notice was prepared and served upon John C. McMurray, president of the Cherryvale Water Company, at Cherryvale, Kan., notifying him of the intention of said city to avail itself of the provisions of said section 9 of said ordinance to purchase said water-works; and

"WHEREAS, Since the service of said notice the supply of water has entirely failed, and said water company has wholly failed to provide a supply of water for any purpose whatever, though notified and requested by said city repeatedly so to do: now, therefore, be it

"*Resolved*, That we hereby notify said Cherryvale Water Company that the city rescinds the notice heretofore served upon said water company that it will avail itself of the provisions of section 9, providing for the purchase of the same, and that said water company be and is hereby notified that said city does not desire to purchase said water company's plant or any portion thereof; that the city hereby demands of said water company that it furnish at once, and within ten (10) days from this date, a supply of water of good quality and sufficient in quantity for fire purposes and for all public purposes for which the city desires to use the same, and for the individual use of all the residents of the city of Cherryvale, and, in case it fails to do so, that the city will, at the expiration of said time, by ordinance duly enacted, declare the franchise of said water company forfeited, and upon such forfeiture the city will at once take the necessary steps to provide itself with water for all purposes.

"Dated at Cherryvale, Kan., this 5th day of June, 1900.        [L. S.]      REVILO NEWTON, *Mayor*.

"Attest: S. J. HOWARD, *Clerk*.

"The above resolution was passed by the city council of the city of Cherryvale at its adjourned regular meeting held on Tuesday evening, the 5th day of June, 1900.                S. J. HOWARD, *City Clerk*."

(Indorsed on back:) "Received June 6, four P. M. —J. M. COURTNEY."

The water company failed to comply with the last resolution, and thereafter, and on August 4, 1900, this suit was brought by the city of Cherryvale against it. The petition sets up ordinance No. 13, and avers that the water company has failed and neglected to furnish good, pure and wholesome water for domestic and sanitary purposes, and that on the 14th day of May the supply for domestic purposes was wholly exhausted; and that it had forfeited all rights under said ordinance. It was prayed that the contract and ordinance be annulled and set aside, and all rights granted thereunder to the water company to occupy the streets and alleys of the city be canceled.

Defendant below filed an answer and cross-petition controverting the allegations in the petition, and setting up the election to purchase, above set forth, also the ordinances passed by the city council recognizing the lake as a water-supply, and praying judgment against the city for hydrant rentals due.

The case was tried before the court without a jury and a decree entered in accordance with the prayer of the petition, which annulled and canceled the contract between the city and the water company.

*Albert L. Wilson*, for plaintiff in error.

*J. F. Bellamy*, and *T. N. Sedgwick*, for defendant in error.

The opinion of the court was delivered by

SMITH, J.: When ordinance No. 13 was passed by the city council, approved by the mayor, and its terms accepted by the water company, the city had power, which power still exists, to purchase or condemn land for water-works purposes and to provide the city with water. (Gen. Stat. 1901, § 1001; *Water-*

*works Co. v. City of Columbus*, 48 Kan. 99, 28 Pac. 1097, 15 L. R. A. 354.)

In the making of such contract the city exercised *quasi*-private power and was governed by the rules applicable to an individual or a private corporation. (*The State v. Water Co.*, 61 Kan. 547, 561, 60 Pac. 337; *Hubbell v. South Hutchinson*, 64 id. 645, 68 Pac. 52.)

A large part of the voluminous record in this case is taken up by the testimony of witnesses introduced by the plaintiff below, showing that the water supplied from the lake was unfit for domestic purposes and dangerous to the public health, and by testimony on the other side contradictory thereto. We are not, however, concerned with such controversy. That question became immaterial after the city had recognized the lake as a source of water-supply by ordinances passed in 1889 and 1895, referred to in the statement, followed by the election of the city to purchase the plant, February 9, 1900. When it passed these ordinances and elected to buy the property, it did so with notice that the water-supply to the residents of the town did not conform to the requirements of the contract. With full knowledge of this, it proceeded in the most solemn manner to declare its election to purchase. Afterward it could not make the unsanitary condition of the water the basis for a suit in equity to oust the company from exercising franchises or rights given it by the city. (*Water Co. v. Grand Junction*, 14 Colo. App. 424, 60 Pac. 196; *Studer v. Bleistein et al.*, 115 N. Y. 316, 22 N. E. 243, 5 L. R. A. 702; Benj. Sales, 7th ed., § 705, and note.)

During the years when it was shown by testimony introduced on behalf of the city that the water was so bad as to be unfit for domestic use, it continued with-

out objection for that reason to pay hydrant rental. The protection of the rights of private consumers was confided by law to its charge.   No citizen could compel the water company to perform its contract with the city.   (*City of Winfield v. Water Co.*, 51 Kan. 70, 84, 32 Pac. 663.)

In *Water-works Co. v. City of Burlington*, 43 Kan. 725, 730, 23 Pac. 1068, 1070, where on the trial the city asserted that the water supplied to it and its inhabitants was not of the quality called for in the contract, but had used the water for a year without objection, the court said :

"It seems strange, however, if the water furnished by the company was really as bad as the city now claims that it was, that the city did not then complain, and then, if the company still persisted in furnishing bad water, declare a forfeiture of the company's franchise."

In *National Water-works Co. v. Kansas City*, 62 Fed. (C. C. A.) 853, 27 L. R. A. 827, 838, Mr. Justice Brewer said :

"In its cross-bill the city has made claim for damages, and insisted that the water-works system does not come up, in efficiency and completeness, to the requirements of the contract.   We agree with the circuit court, after reviewing carefully the testimony, that the city is not entitled to maintain this claim. It has for many years recognized and accepted this water-works system as having been constructed in full compliance with the demands of the contract, and it is now too late to repudiate such recognition."

There is no distinct claim or demand for specific performance of the contract contained in the answer and cross-petition of the water company.   Counsel for the company, however, in his brief contends that the acceptance by the city of the option to purchase gives

the water company a right to have the conditions of
ordinance No. 13 specifically enforced. The argu-
ment is that the city must do equity; that, having ac-
cepted the conditions of the contract, it cannot now
repudiate such conditions and invoke equitable relief
against the water company; that a right to specific
performance of the agreement by the plaintiff in error
must necessarily defeat the city in its efforts to cancel
and annul the contract in an equitable suit. We
agree with counsel in this claim.

When the city granted this franchise by ordinance
No. 13, on June 25, 1885, it was stipulated in one of
the sections that it should be a contract "binding
upon all parties with equal force." When the water
company accepted the conditions of the ordinance, it
was agreed that the city might purchase the works at
the expiration of ten years, and, failing at that time,
then at the expiration of every five years thereafter,
at the appraised valuation of three disinterested per-
sons. It did elect to take the plant at the end of the
second period. The water company bound itself in
advance to sell. When the city elected by giving the
notice, a binding contract of purchase was consum-
mated. (*Rockport Water Co. v. Rockport*, 161 Mass.
279, 37 N. E. 168; *Cooper v. Lansing Wheel Co.*, 94
Mich. 272, 54 N. W. 39, 34 Am. St. Rep. 341; *Caldwell
v. Frazier*, ante, p. 24, 68 Pac. 1076; *Chadsey v. Cond-
ley*, 62 Kan. 853, 62 Pac. 663.) The contract was mu-
tual and based on a valuable consideration.

It may be stated as a rule of law which had its
origin in the English cases that an agreement to sub-
mit to arbitration will not be specifically enforced
in equity. (*Milnes v. Gery*, 14 Ves. Jr. 400.) This
general rule, however, has not been applied with
strictness in this country, and has been expressly de-

nied as applicable to a state of facts substantially like those appearing in the case at bar, as will be presently shown.

The case of *Bristol v. Bris. & Warren Water Wk's*, 19 R. I. 413, 34 Atl. 359, 32 L. R. A. 740, is quite similar in its facts to the present one.. The town of Bristol granted to a water company the right to use its public streets, squares and alleys for the purpose of laying down pipes, for a period of fifty years, or until the town should avail itself of the option of purchase reserved to it in the contract, the town agreeing to pay the company $3000 each year for the use of hydrants and water required for fire purposes. The company agreed to complete its system of water-works and supply the town for domestic, manufacturing and other uses, to furnish hydrants, and to maintain at all times a head of water not less than 125 feet above high tide. It was conditioned that the city might purchase at any time after ten years and within fifteen years from the date of the contract, for a fair and reasonable price, to be agreed upon by the town on one part and the company on the other, or fixed by a majority of arbitrators appointed for the purpose, one by the town, one by the water company, and the third by the two so chosen. After the expiration of ten years the town concluded to buy the plant of the water company in accordance with the terms of the contract, and requested the company to agree upon a fair and reasonable price to be paid for the works, which it refused to do, and further refused to appoint an arbitrator to determine the same in accordance with the contract. On this state of facts, a bill was filed by the city to compel a conveyance of the plant to it upon payment by the complainant of a fair and reasonable price. It was objected, upon demurrer, by

the water company that the contract for the sale of the property at a price to be fixed by arbitrators could not be specifically enforced, one of the parties having refused to appoint an arbitrator, and that the court could not upon application of the other party either fix a price itself or appoint an arbitrator. Answering this objection, the court said :

"But, as well stated by complainant's counsel, where the contract to sell does not stand alone, but is merely a subsidiary part of another contract for a more extensive purpose, the performance of which has already been entered upon, a different rule prevails. In such a case the courts hold that the manner of determining the price is a matter of form rather than of substance ; and if it becomes evident that it cannot be determined in the manner provided for in the contract, by reason of the refusal of one party to do what in equity he ought to do, the court will determine it upon the application of the other. *Coles v. Peck*, 96 Ind. 333, 49 Am. Rep. 161. In other words, if the parties have incurred obligations under the contract so that they cannot be placed *in statu quo*, the court will itself enforce the agreement. *Tscheider v. Biddle*, 4 Dill. 55 ; *Herrman v. Babcock*, 103 Ind. 461, 3 N. E. 142 ; *Lowe v. Brown*, 22 Ohio St. 463 ; *Biddle v. Ramsey*, 52 Mo. 153. See, also, Morse on Arbitration and Award, 94 ; Pomeroy on Specific Performance, sections 148–151 ; Waterman on Specific Performance, section 44."

.    .    .    .    .    .    .    .    .    .    .

"Pomeroy on Specific Performance, section 151, states the law applicable to this class of contracts as follows : 'The second class embraces those contracts in which a mode for ascertaining the price is mentioned, but from the language of the stipulation it is regarded as non-essential, and as something rather by way of suggestion, so that the agreement itself is virtually one to sell for a fair price. In such a case, if the means specified for fixing upon the price fail for any reason, the court does not treat the contract as

fatally defective, but will, in the suit for a specific performance, direct a fair and reasonable price to be ascertained in some manner preliminary to the decree, either by referring the matter to a master or other officer, or by appointing a skilled person as a special valuer, or even by determining the amount itself; it will pursue any such mode as the circumstances of the case show to be expedient. The tendency of the later English decisions is to consider these stipulations for a determination of the price by third persons rather as matters of form than of substance; to construe them in such manner that they become incidental only to the main object of the agreement. The court will always look at the substance of the agreement, and disregard the mere forms which had been provided for effectuating it, and which cannot be made operative.'

. . . . . . . . . . .

"'Equity regards not the form, but the real nature of the transaction.' *Thompson v. Taylor*, 12 R. I. 109, 111. The case before us is a typical one for the application of this doctrine. The agreement to sell is clearly a subsidiary part of a much more extensive contract— a contract by virtue of which the respondent has for nearly fifteen years enjoyed exclusive privileges in the highways of said town, and collected large sums of money from the town and its inhabitants, and by virtue of which it may continue, unless said sale can be consummated or other relief be granted, to enjoy the same exclusive and valuable franchise for the remainder of said term of years. Nor can the complainant by any possibility be put in the position in which it was before the contract was executed."

In *Coles et al. v. Peck*, 96 Ind. 333, 339, 49 Am. Rep. 161, in commenting on the rule laid down in *Milnes v. Gery*, supra, it was said:

"The doctrine of that case has, however, generally been followed by the courts of the United States, only in a limited and restricted sense, and is mainly applied only to contracts for reference, in which, by the

form and language of the stipulation, the mode of determining the price by values, on arbitration, is made an essential provision—in fact, condition—to the validity of the agreement, and to cases in which the parties can be easily placed *in statu quo*, or where an action for damages can be made to afford an adequate remedy.

"There is another recognized class of contracts providing a mode for ascertaining the price of property by arbitration or reference, in which the language used in the stipulation is treated as non-essential, and as more in the nature of a suggestion, regarding the stipulation itself as virtually an agreement to sell the property at a fair price."

Holding the opinion that the contract to purchase may be specifically enforced, notwithstanding the arbitration clause, it follows that the city cannot call on a court of equity to do that which is not equitable, and thus obtain its release from an obligation deliberately assumed with full knowledge of all the facts, and in no manner induced by fraud or deception of any kind.

The fact that the water-supply failed for a time after the three-months notice to buy had expired cannot affect the legal status of the parties under the contract fixed at the time the city elected to take the plant. An election once made binds the party. He cannot afterwards take the other alternative. (Bish. Cont. § 784; *Brown v. Royal Insurance Co.*, 1 Ell. & Ell. 853; *Childs v. Stoddard*, 130 Mass. 110.)

It will be observed that the three-months notice to purchase was given by the city to the water company on February 9 and expired May 9, 1900. The resolution passed by the city council rescinding the election to purchase was passed on June 5, 1900, and a copy of the same served on the water company the next day. There is no provision in ordinance No. 13

when the arbitrators shall be chosen, either before or after the expiration of the five-year perio⌐. It is contended by counsel for defendant in error ⸱ ᵗ there was no purchase of the property by the city when it served its notice of election. However this may be, there was a valid contract of purchase, made in acceptance of a continuing offer to sell, extended to the city by the water-works company by the terms of ordinance No. 13. The fact that the city could not get absolute title until June 25, 1900, did not affect the binding force of its agreement to purchase. There was nothing to be done after its election to buy except the fixing of the price to be paid.

Again, it is contended that at the time the contract was made the city had no power to issue obligations in payment of the price of the works, as provided in section 9 of the contract. If this were true it could not avail the defendant in error. In *Hitchcock v. Galveston*, 96 U. S. 341, 24 L. Ed. 659, the city council had contracted to build certain sidewalks, to be paid for by city bonds. The work was partly performed, but the city council stopped the same and prevented its completion. It was urged, in an action for breach of contract, that the city had no power to make such agreement, in that it had no authority to issue bonds of the city. The court said:

"It is enough for them (the plaintiffs) that the city council have power to enter into a contract for the improvement of the sidewalks ; that such contract was made with them ; that under it they have proceeded to furnish material and do work, as well as to assume liabilities ; that the city has received and now enjoys the benefit of what they have done and furnished ; that for these things the city promised to pay ; and that after receiving the benefit of the contract the city has broken it. It matters not that the promise was to pay in a manner not authorized by law. If pay-

ment cannot be made in bonds because their issue is *ultra vires*, it would sanction rank injustice to hold that payment need not be made at all. Such is not the law. The contract between the parties is in force so far as it is lawful." (See, also, *The State Board of Agriculture v. The Citizens' Street R. W. Co.*, 47 Ind. 407, 17 Am. Rep. 702.)

The case of *Hitchcock v. Galveston*, supra, is quoted from approvingly in *Water-works Co. v. City of Columbus*, 48 Kan. 99, 114, 28 Pac. 1097, 15 L. R. A. 354.

There was no lack of power, however, to issue bonds in payment of the purchase-price of the works at the time the election to buy was made, for, by chapter 82, Laws of 1897, such power is expressly conferred. In fact, under the election proclamation of August 11, 1900, the city was proceeding to vote bonds for the erection of water-works, not exceeding $12,000 of the issue to be used in purchasing such part of the machinery, tools, pipes, etc., of the Cherryvale Water Company as might be needed.

The court below, in its decree, not only ousted the water company from the exercise of its franchises under ordinance No. 13, but also refused to require payment of the city to it for hydrant rental then due. Cities are bound to the exercise of good faith in the fulfilment of contracts to the same extent that such obligations are imposed upon individuals, and in this case an approval of the judgment of the trial court would work an injustice and the abrogation of solemn engagements not to be countenanced in a court of equity.

The judgment of the court below will be reversed, with directions to proceed further in accordance with the views expressed in this opinion.

All the Justices concurring.