| 73 | 53 |
| 96 | 190 |
| 73 | 53 |
| 102 | 611 |
| 73 | 53 |
| 114 | 46 |

Moses Taggart, Attorney General, ex rel. John H. Seitz, Jesse H. Farwell, et al., v. The Board of Auditors of Wayne County.

*Board of auditors of Wayne county—Board of supervisors—Purchase of county buildings—Constitutional law—Equity— Bill by Attorney General.*

1. The board of auditors of Wayne county have no power to purchase a site for county buildings, the purchase or erection of which being outside of their jurisdiction

2. There has never been any rule in equity preventing the Attorney General from acting on relation, so long as the grievance is one affecting the public interests, and he retains control of the suit. It is rather to the defendants' advantage to have a private person responsible for costs, and this is a chief reason why such action has been allowed. 1 Daniell, Ch. Pr. 13 *et seq.*

3. The opinion reviews exhaustively the county system, whether under commissioners, or, later, a board of supervisors, and the constitutional provisions governing the powers of the latter body and of the respondents.

Appeal from Wayne. (Hosmer, J.) Argued October 24, 1888. Decided November 28, 1888.

Bill to restrain the board of auditors of Wayne county from purchasing a lot for county purposes. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*Moses Taggart,* Attorney General *(Levi T. Griffin,* of counsel), for complainants.

*Edgar Weeks (Otto Kirchner,* of counsel), for respondents.

[The opinion contains so exhaustive a review of the statutes applicable to the case that a summary of briefs of counsel is omitted.—REPORTER.]

CAMPBELL, J. The bill in this case is an *ex officio* information to restrain the board of county auditors of Wayne county from buying a lot for county buildings, of the value of more than $100,000. The bill contains charges of fraud and collusion. In the Wayne circuit court, where the cause was heard, a final injunction was granted as prayed. Defendants appeal.

A preliminary objection was made that the relators have no standing in court, and that the suit is not in proper form. If the bill was filed to obtain relief for

them the objection would have force. But there has never been any rule in equity preventing the Attorney General from acting on relation, so long as the grievance is one affecting the public interest, and he retains control of the suit. It is rather to the defendants' advantage to have a private person responsible for costs, and this is a chief reason why such action has been allowed. 1 Daniell, Ch. Pr. 13 *et seq.*

Leaving aside the question of fraud, which, so far as dishonest design is concerned, is not made out, the objections to defendants' action are directed against two alleged violations of the law:

1. That the expenditure will involve more money than can be borrowed or made a county burden without a popular vote.

2. That the defendants are acting without authority in a matter belonging to the board of supervisors.

The last objection is the most important in the present case, inasmuch as defendants claim to have in hand, by what precise means does not appear, a large sum of money, which might perhaps pay for the land which they may seek to buy. It is not claimed that the site, if purchased, can be made available without borrowing or taxation; and a purchase of land to lie idle, or for other than legitimate county purposes, would be a very unusual transaction, if no more.

The counsel for defendants placed part of the argument on the ground that defendants are a corporation, and in their corporate capacity have unrestrained powers of purchase. But this is not so. While under the Constitution Wayne county is under different conditions from those attaching to counties generally, yet it does not differ from them in the nature of its corporate character. Under that instrument, as under the former laws, the county is the corporation, and not its officers. Its cor-

porate name was formerly, and is permissibly now, for purposes of suit, identical with the board of supervisors, but they have no corporate character, except as standing for the county. They are its officers and agents, but no more. They and the county auditors have always been classed as county officers. For certain purposes they represent the county. But they have no independent corporate powers. They cannot acquire or hold any property but county property. And they have no powers except on the county's behalf. And public corporations have not usually unlimited corporate power even over subjects that they can act on.

We are therefore required to consider what, if any, power they have to act for and bind the county in the manner complained of. The inquiry involves important considerations, and on the argument was treated somewhat historically. The researches of counsel were confined mainly to what is found in the Revision of 1838 and since. But the county system is much older, and some light is found in earlier legislation. The progressive steps taken indicate in what way the popular representation in county affairs has been secured.

In the early days of the territory, when no popular representation existed, county business was conducted for a while by analogy to the English system of quarter sessions and justices. Until about 60 years ago we had no populous counties, and very few organized counties. The larger share of the people were not born or reared under common law or popular institutions. Until 1824 there were no popular institutions at all, and all officers were appointed by the executive. In the latter days of that system county commissioners appointed by the Governor conducted the very small amount of county business needing attention. In 1827 these commissioners were superseded by a board of elected supervisors, who had control

of all that was done, but could not burden the county, except within fixed limits. 2 Terr. Laws, 325, 583, 688. Between that time and the Revision of 1838 several acts were passed, authorizing money to be borrowed, and county buildings to be erected, but in no instance in considerable sums, without a popular vote.

It is very well known that the action of the reviser in abolishing the board of supervisors and substituting county commissioners in their stead for county business took the people by surprise, as he had received no instructions to do so.    The population was somewhat mixed, a part of the American immigrants having been used to the commissioner system, but a much larger part having lived under the supervisor system.    The difference was chiefly, as the new law was framed, between representation of towns on the county board, and representation by a general vote of the people in the county.    This Code was made to take effect August 1, 1838, and it became necessary to provide for what should be done between the adoption of the statutes and the election and qualification of the new county officers, which could not occur till some time later.    By Sess. Laws of 1838, p. 231, it was provided that the board of supervisors should continue to act until the commissioners should be elected and qualified, and during the same interval the boards of supervisors of Kent and Kalamazoo were authorized to borrow sums mentioned in the statutes for county buildings. Laws of 1837–38, pp. 61, 235.    In the previous year a general law had been passed, authorizing the borrowing of money for county buildings and bridges by the supervisors, but only on a popular vote.    Laws of 1837, p. 129.

Before the Revision of 1838 there had never been any single statute reciting in full and at length all the powers and duties of the board of supervisors or their successors in county business.    Powers had been given at different

times and specifically. The Revised Statutes of 1838, under the head of "County Officers," enumerated the powers of the county commissioners in like manner, but with some differences, as they have been since defined. By that Code no money could be borrowed except for the purposes of public buildings, and then only on popular vote; and, while repairs could be made by the commissioners, they could not exceed $500 a year. Rev. Stat. 1838, pp. 40, 41. The purpose of this statute was to bring together as far as practicable such provisions as were meant to regulate the general county business. The commissioners had more or less other powers, vested in them rather from convenience than because the county at large was much interested in them.

In 1842 an act was passed, to take effect after the second Monday in April of that year, abolishing the office of county commissioner. The original functions were transferred to the board of supervisors, all of whom were elected annually, and a new set of officers would qualify at the time provided for the operation of the act. The appellate jurisdiction of the commissioners over some local matters was vested in the judge of probate and the associate judges of the circuit. Laws of 1842, p. 22.

In Michilimackinac and Chippewa counties, where there were not supervisors enough to act, one supervisor and the two oldest justices were to act. In 1844 Michilimackinac was brought under the general rule. Laws of 1844, p. 74. During the same year a board of county auditors was provided for in Wayne county, consisting of three elected members, no two of whom could be in one township, village, or city. They had the powers of the board of supervisors, except the equalizing of assessments and apportionment of taxes. Laws of 1844, p. 122. This was the beginning of the board of county auditors in Wayne county, and the provisions of this act, as

somewhat modified afterwards, are mainly what defendants now claim to govern them.

In 1845 provision was made more specifically for annual elections of one commissioner, and for filling vacancies by the board of supervisors. Laws of 1845, p. 45.  A few days after this act was passed, another act was also passed which, excepting from its operation Oakland county, but not Wayne, allowed the supervisors of each county to spend for county buildings $2,000 on their own motion. Any larger amount was to be authorized by a popular vote. Page 54.

The next year—1846—a new volume of Revised Statutes was adopted, to take effect in March, 1847. By this Code the Wayne county auditors were classed in the list of county officers.  The general powers of the board of supervisors were enumerated in the first 26 sections of chapter 14.  The twenty-seventh, twenty-eighth, and twenty-ninth sections gave the county auditors all of their powers contained in that statute or elsewhere, except the business connected with the assessment and collection of taxes.  The auditors were to report annually to the supervisors the amount of tax necessary.  This statute contained no provision for filling vacancies.  Possibly the law of 1845 on this subject remained in force. It is not necessary to enquire into this.

It seems probable that in 1848 some controversy had arisen between the auditors and supervisors concerning payment for a new jail in Wayne county; for a statute was passed requiring the auditors to include past and future expenses for the jail building in their estimate, and the supervisors were authorized to have $9,000 assessed for that purpose beyond the ordinary county tax. Just how this building became subject to special intervention does not appear. Laws of 1848, p. 31.  In that year the State appropriated lands to rebuild two bridges over the

river Rouge, and the auditors were intrusted with the work, which had no county money expended on it. Laws of 1848, p. 432. In 1850 the auditors were authorized to build bridges on two other streams, confining themselves, however, to the sums fixed by the general law. Laws of 1850, p. 232.

This is the course of legislation previous to the Constitution of 1850. At that time the county auditors seem to have had the same general powers, except as to taxation, possessed by the board of supervisors. Their action in passing upon claims, like that of the supervisors, was appealable to the circuit court, but covered all claims subject thereto.

The question now before us is, in substance, whether the Constitution of 1850 and the legislation under it have changed the powers of the auditors, and confined them within closer limits.

It is claimed by the Attorney General that by the express terms of the Constitution the boards of supervisors in every county, including Wayne, had certain powers conferred on them exclusively, and that the Wayne county auditors were only secured in their functions of settling compensation and auditing accounts for services against the county. The portions of the Constitution relied on are a clause in Article 4, § 38, on the legislative department, which empowers the Legislature to confer on boards of supervisors powers of local legislation and administration, and Article 10, on counties, which contains several provisions on the subject. By section 6 of Article 10 a board of supervisors was created in each county, consisting of one member from each township; and by section 7 cities were also to be represented on the board, as the Legislature should direct. Their powers and duties were to be such as should be prescribed by law.

By section 3 they were authorized to unite into one office or disconnect the offices of county clerk and register of deeds.    By section 8 they were authorized by a vote of two-thirds to designate a new county-seat, to be voted on by the electors.    Section 9, which is directly involved in this suit, is as follows:

" The board of supervisors of any county may borrow or raise by tax one thousand dollars for constructing or repairing public buildings, highways, or bridges; but no greater sum shall be borrowed or raised by tax for such purpose in any one year, unless authorized by a majority of the electors of such county voting thereon."

Section 10 contains the only reference to county auditors.    It is as follows:

" The board of supervisors, or, in the county of Wayne, the board of county auditors, shall have the exclusive power to prescribe and fix the compensation for all services rendered for, and to adjust all claims against, their respective counties, and the sum so fixed or defined shall be subject to no appeal."

The eleventh section contains no reference to county auditors, and provides for action by the supervisors in laying out roads and bridges, and organizing townships, under proper legislation.

Several of these powers to be conferred on boards of supervisors were new, and some were already more or less within the range of existing laws regulating the supervisors and Wayne county auditors.    The fact that the auditors are expressly mentioned in only one section with the supervisors is very significant, and according to the usual rules of construction would confine their powers to those mentioned in that section, as far as such powers are enumerated.    In regard to powers not so enumerated, either of supervisors or auditors, the Constitution would not repeal or affect them unless repugnant.    But as, apart from the constitutional grant, all the powers of both

bodies depended on legislation, they could be changed or abolished at will. How far this has been done by legislation, except as to the particular powers before us, we need not now consider. It would involve an examination into many statutes, and would be speculative.

It was contemplated that the Legislature of 1851 would be much occupied in harmonizing the statutes with the Constitution, and in order to save confusion it was declared in the schedule (section 8) that all county officers, unless removed, should hold office until January 1, 1853. In the meantime the usual elections would be held for filling them, as vacancies arose, and could be provided for by the new statutes of 1851. But the change from annual to biennial elections would require considerable pains in adjustment where offices terminated annually, and this would affect the tenure of the county auditors. But this did not at once strike attention.

Before referring to the legislation of 1851 it may be well to consider the action which led to the constitutional changes.

The original Constitution, and legislation under it, which had been provided for the appointment of the State and some of the county officers, became subject, under an amendment adopted in 1849, to a system of popular election, and the convention of 1850 followed out in most things the policy of putting public affairs, from the greatest to the least, in the hands of elected officers. This idea was further extended so as to have each small district entitled, as far as possible, to a representative voice in public business. The debates of the convention throughout indicate the prevalence of this spirit, and no subject was more dwelt upon than the importance of giving to the board of supervisors, in which every town was directly represented, an enlarged control of county interests. In the debates no one opposed the propositions

which gave the general county business in every county into the care of the supervisors. The only subject on which any other board was suggested was that dealt with in the section which now stands as section 10 in Article 10, where the Wayne county auditors are now recognized. Mr. Fralick, who was himself a county auditor, moved to insert in that section as donees of the power mentioned in that section "supervisors, or county auditors," thus leaving the Legislature power to give to any county such an auditing board of claims. This amendment was rejected. Debates, p. 519. Subsequently, on representation that such a board could deal more easily with claims, and could meet more frequently and cheaply, and that the Wayne county business was very large, the convention allowed the alternative for Wayne county, but for no other. There can be no doubt that the convention meant to exclude any board but the supervisors from managing the business given into their charge by the Constitution in express terms, except in the single subject of services and claims, in Wayne county. But by this single reference, without any direction how the board should be made up, it was necessarily left to the Legislature to provide for this, inasmuch as by abolishing annual elections it became impossible to elect one member each year, and some change was unavoidable.

Not only is it plain from the natural meaning of the Constitution that such powers as the Constitution itself gave to the supervisors should be exclusive on all but the one class of powers referred to in section 10, but the Legislature of 1851, on which the duty had been laid of bringing the statutes into harmony with the Constitution, gave to this article a practical construction in the same direction.

As already mentioned, the general powers of all the county officers for county purposes were contained in one

chapter, numbered 14, of the Revised Statutes. First in order came the board of supervisors; next, the Wayne county auditors; and, further on, the sheriff, clerk, treasurer, register, and others, for all of whom particular provision was made. The first 26 sections covered all the usual powers of the board of supervisors of any great importance. Sections 27 to 34 provided for the exercise by the Wayne county auditors, not only of the powers given to the board of supervisors by sections 1 to 26, excepting those relating to taxation, but also of all their other powers under any other law in or outside of that chapter. There were other powers so vested on various subjects, some or most of which, being outside of the constitutional enumeration, are within legislative discretion, and may be vested where that body chooses, unless prevented by some plain implication.

In the session of 1851 an act was passed with this title:

"An act to define the powers and duties of the boards of supervisors of the several counties, and to confer upon them certain local, administrative, and legislative powers." Laws of 1851, p. 231.

This is an independent act, not passed as an amendment of the Revised Statutes, or of any other act, and was meant to cover, as far as practicable, the entire general functions of the boards of supervisors. It provided how cities should be represented on such boards, and made specific provisions upon most, if not all, of the constitutional grants of powers to the supervisors, and saved all powers given by other acts and not enumerated, most of which were outside of county administration.

It then repealed expressly the 26 sections in chapter 14 of the Revised Statutes, which had been the previous source of power to the supervisors, when the whole subject was under control of the Legislature. The auditors

are not mentioned in the title or in the body of this act.

The effect of this repeal was for all the future to leave chapter 14 of the Revised Statutes as if no such sections as those from 1 to 26 had ever existed; and it therefore left nothing under that chapter for the board of auditors to do, except what was given them by the later sections. Those powers related specifically to nothing whatever, and by reference only to such powers as were to be found in other provisions of law. They could not include the then future legislation of 1851, which superseded the other sections, and contained no reference to the auditors. The Constitution had recognized them for the purposes mentioned in section 10 of the article on " Counties," and thus far continued their powers, but except thus far they have no constitutional powers, and are subject to legislative regulation, and they have none of the powers given to the supervisors by the law of 1851 outside of those covered by the Constitution itself. It does not seem to have been discovered until 1855 that this corporate succession of the auditors could not be kept up by annual elections, as provided for in the former laws. By statute of that year (Laws of 1855, p. 152) it was provided that one auditor should be elected by the people each year when there should be a general election, and one by the board of supervisors each year when no election is held. It resulted that there was always one auditor, and sometimes more than one,—or a majority,—not chosen by the people. This was inevitable without a change in the term of office; and the general constitutional policy of local regulation by direct elected representation would have been subjected to a radical change in the most populous county in the State had this board been retained as a general substitute for the board of supervisors.

The subject of purchasing or erecting public buildings is therefore outside of their jurisdiction.

It was urged on the argument . that a long practical construction has prevailed to such an extent that it must be deemed acquiesced in to the contrary. We doubt very much whether this is true in fact. So far as the record in the present case is concerned, it does not indicate that the constitutional limits have been habitually violated. The powers not contained in chapter 14 of the Revised Statutes are not all, and perhaps are not mostly, covered by the Constitution, or beyond the power of the Legislature to confer. Whatever may be the fact as to contracts still executory, there is no difficulty in maintaining the title to lands deeded to the county. Acquiescence by the supervisors and the people in arrangements now existing, and of possible doubt, will. probably save any serious difficulty from any business heretofore done.

The powers included in the constitutional grant of authority, directly or by fair implication, are very important. Other statutory powers, not contained in chapter 14 of the Revised Statutes, or covered by the act of 1851, must stand on their own grounds, and are not before us for consideration. But neither legislation nor acquiescence can take away from the supervisors any of the jurisdiction given them by the Constitution, and not given by that instrument to the county auditors of Wayne.

The powers sought to be restrained are within the exclusive grant to the board of supervisors, and the auditors have no control over them.

The decree must be affirmed, with costs, which, under all the circumstances, may be regarded as a proper charge against the county. The auditors are not to blame for bringing the questions into this Court for settlement.

The other Justices concurred.