HARTINGH *v*. BAY CIRCUIT JUDGE.

1. INJUNCTION—PLEADING—EQUITY—AFFIDAVITS.

In equity, it is a general rule that an injunction will not issue on a bill verified upon information and belief, unless it is supported by affidavits of persons who have knowledge of the facts: the pleading may be sworn to by complainant if he knows a part of the material facts and states the remainder on information and belief; and it is proper to support the same by affidavits of those who know the matters not positively averred.

2. SAME—ANSWER—DISSOLUTION.

The equity of the bill was not fully met so as to require the dissolution of an injunction restraining a village council from granting licenses to more retail liquor dealers than the statute authorized, where complainant charged that defendant board of trustees of the village threatened to grant more retail liquor licenses than the law warranted, and set up facts showing the applications made and the purpose of a majority of the trustees to issue the licenses, and where defendant's answer merely negatived any threat to grant the applications as alleged but did not deny the other material averments.

3. INTOXICATING LIQUORS—SALOONS—DEATH OF LICENSEE.

Under the provisions of the Warner-Cramton act (Act No. 291, Pub. Acts 1909, 2 How. Stat. [2d Ed.] § 5055 *et seq.*), the death of a saloon keeper terminates his license, and it is treated as a surrender, reducing the number of saloons that may be lawfully licensed in a community that had more than one saloon to 500 inhabitants at the time the law went into effect.

4. SAME—LICENSE—VILLAGES—ESTATES OF DECEDENTS.

The right to carry on the business of selling intoxicating liquors at retail is in the nature of a personal license, and does not pass to the personal representatives of a deceased licensee.

5. SAME—STATUTES—ESTATES OF DECEDENTS.

The amendment of 1911, Act No. 170 (2 How. Stat. [2d

176 MICH.—19.

Ed.] §§ 5056, 5062 *et seq.)*, does not apply to licensees who died before the act took effect: it recognizes, however, that a license is surrendered on the death of a licensee and adds a period of grace on the filing of a new bond by the administrator. At the end of the year for which the license was granted all rights thereunder end and no authority to apply for a renewal vests in the personal representative.

6. SAME—VOLUNTARY SURRENDER.

The decease of a licensed saloon keeper works a voluntary surrender within the meaning of the statute.

7. SAME—EQUITY—INJUNCTION—PARTIES.

The attorney general is a proper party complainant in equity to prevent the violation of law by village trustees by the unlawful issuance of licenses to retail liquor dealers.

Mandamus by George Hartingh and others, as trustees of the village of Pinconning, against Chester L. Collins, one of the circuit judges for the county of Bay, to compel respondent to vacate a preliminary injunction issued in a suit in which the attorney general is complainant and relators are defendants. Submitted May 1, 1913. (Calendar No. 25,683.) Writ denied July 9, 1913.

*Joslyn & Houghton* and *W. A. Collins,* for relators.

*W. B. Henry* and *C. A. Higgs,* for respondent.

STONE, J. In this proceeding relators, who are members of the council of the village of Pinconning, Bay county, pray for a writ of mandamus directing the respondent to vacate an order made by him on April 23, 1913, denying a motion to dissolve a preliminary injunction, and to dissolve said injunction. It appears that on April 14, 1913, the attorney general, on relation of John W. Kinsey, Albert Butler, and John C. Salmon, three residents and property owners of said village, filed an injunction bill in the

Bay circuit court, in chancery, and on application to respondent a temporary injunction was issued and served on relators. Said bill sets forth that relators were the trustees, president, and clerk of the village; that the last United States census showed the population of said village to be 750; that in April, 1909, there were six licensed saloons in said village; that subsequent to said date, and prior to May 1, 1911, two of said saloon keepers had died during the time their licenses were in force; that by reason thereof the number of saloons legally authorized in said village was reduced from six to four, but that during 1912 six saloons were licensed and did business in said village. The foregoing statements are set forth as positive averments of fact. The remainder of the bill states upon information and belief that the six persons conducting saloons in said village in 1912 have already made, or will make, application to said village for permission to renew their licenses; that said trustees will be asked to approve six applications to conduct saloons in said village, and that said trustees threaten to approve six applications to conduct saloons in said village, and that unless restrained by the court will approve six applications to conduct saloons therein. Complainants allege in their bill that they based their conclusion upon certain statements made by a majority of the members of the village council, and claimed that the proposed action would be a violation of Act No. 291 of the Public Acts of 1909 (2 How. Stat. [2d Ed.] § 5055 *et seq.*). The bill was verified in the usual form by Albert Butler, and there accompanied the bill the affidavits of Albert Butler and three other persons, setting forth statements made to or in the hearing of affiants, by four members of the council, to the effect that the council would accept and approve six applications for liquor licenses in said village.

The answer of the defendants (relators here) admitted that six persons had made applications for liquor licenses for the year 1913, but denied that trustees and members of said council threatened to approve of six; they denied that complainants had any information upon which to base the statement, made on information and belief, "that unless restrained by order of the court said trustees will approve six applications to conduct liquor business;" they denied that complainants had information upon which to base a statement as to what action would be taken by the village council; denied that the allegations set forth were supported by the affidavits referred to; denied that the allegations in said affidavits or the statements therein made, if true, supported the allegations of the bill, and denied that the approving of six applications and bonds to conduct retail liquor business in said village for 1913 would be a violation of the laws of this State, particularly the so-called "Warner-Cramton Law," and denied that such licenses, if granted, would be illegal, and that the place where the sale of liquor would be had would be a nuisance and work an "irremediable" injury as claimed in the bill. A motion to dissolve the preliminary injunction was thereupon made and denied by the respondent.

Relators say in their brief that the questions involved in this issue are:

(1) May a temporary injunction issue on a petition verified only upon information and belief?

(2) Does the death of a saloon keeper constitute a voluntary surrender of his license pursuant to section 39, Act No. 291, Public Acts of 1909?

(3) There is no equity in the injunction bill.

1. While the bill or information itself states many of the material matters on information and belief, it is supported by affidavits setting forth matters which

show statements made by a majority of the council relative to the intention of such members to approve the applications and bonds in question. This bill was verified by one of the persons upon whose relation it was filed in accordance with Chancery Rule 2. It was proper practice to support the bill by accompanying affidavits of persons having knowledge of the facts. This court said in *Manistique Lumbering Co.* v. *Lovejoy,* 55 Mich., at page 193 (20 N. W. 900):

"It is a cardinal rule in equity that a preliminary injunction should never be granted without the oath of some one, from his own knowledge, of such facts as will justify it."

We are of opinion that the practice followed in this case satisfies that rule. In *Allen* v. *Wayne Circuit Judge,* 159 Mich. 612 (124 N. W. 581), it was said:

"As the same (the bill) was based upon information and belief, it *alone* would not have justified the allowance of the writ."

This clearly recognizes the practice that the bill may be supported by other proof.

Counsel for relators urge that the answer denied the material allegations of the bill, and for that reason the injunction should have been dissolved. The answer does not fully and frankly deny the material allegations of the bill. It is true it denies that the defendants "threatened" to approve of six applications to conduct retail liquor business in said village, but it nowhere states that they do not intend to do so, but proceeds to state that such course would not be a violation of the statute.

It is well-settled equity practice that if, after the answer comes in, there remains a reasonable doubt as to whether the equity of the bill is sufficiently negatived, the court may continue the injunction to the hearing. In continuing and dissolving injunctions, the relative inconvenience to be suffered by the

parties may be of controlling weight. For instance, although the answer denies all the equity of the bill, yet the injunction will be continued in case its dissolution might thwart the object of the litigation and render a subsequent victory by the complainant of no avail. 22 Cyc. p. 978, and cases cited; *Attorney General* v. *Oakland County Bank,* Walk. Ch. (Mich.) 90; *Chicago, etc., R. Co.* v. *Kalamazoo Circuit Judge,* 138 Mich. 246 (101 N. W. 525).

2. Upon the main question involved, the learned circuit judge, in an opinion filed denying the motion to dissolve the injunction, has so clearly and fully stated the law of the case that we insert the same here:

"The attorney general, on the 14th day of this month, filed in this court an information asking for a permanent injunction against the village trustees of the township of Pinconning, restraining them from approving the bonds of more than four retail liquor dealers in the village of Pinconning for the year commencing May 1, 1913, and asking a temporary injunction to issue pending the final hearing in the case, or until the further orders of the court. On the 21st day of this month the defendants filed an answer to said information, and made a motion for the dissolution of said temporary injunction. This motion has been fully argued by opposing counsel.

"The Warner-Cramton liquor act took effect in September, 1909. It provided for a reduction in the number of saloons until the number was fixed at one for each 500 inhabitants of the city, township, or village in which the dealer was situated. It fixed as the number from which the reduction should be started the number of retail liquor dealers in business in the designated municipality in April, 1909. In April, 1909, the number of retail liquor dealers in the village of Pinconning was six, and by the census of 1910 the population of the village of Pinconning did not exceed 750. Between May 1, 1909, and May 1, 1910, Mr. Smith, one of the retail liquor dealers in Pinconning, to whom a license was issued, died, and

between May 1, 1910, and May 1, 1911, Mr. Green-leaf, another of said licensed retail liquor dealers, died.

"By the act of 1911 amending the Warner-Cramton law these two elements were incorporated into the liquor law; *first,* the approving council or board of trustees or township board was authorized without assigning any cause, to reject any offered bond; *second,* in case of the death of a licensee his administrator or executor was personally, as such, permitted to carry on the business for the remainder of the licensee's year; no other privilege as to time or succession, however, being granted. In April, 1910, the trustees of Pinconning approved six liquor bonds for the ensuing year, and in April or May, 1911, the same board approved six liquor bonds for the year commencing May 1st, and in April or May of 1912, the same council approved six liquor bonds.   \*   \*   \*

"It clearly appears, from the information and answer, as matter of fact, that a majority of the members of the board of trustees of the village of Pinconning firmly believe that they have the legal right under the existing conditions to approve six retail liquor bonds, that notwithstanding the facts in this opinion enumerated, the trustees have for three years, since the Warner-Cramton act took effect, approved that number of such bonds each year, and that unless restrained by the temporary injunction of this court, they will approve all six retail liquor dealers' bonds for the year commencing May 1, 1913. This situation presents for the consideration and decision of this court the question as to whether or not by reason of the death of Mr. Smith and Mr. Greenleaf the number of bonds which the village trustees may approve is reduced from six to four.

"Under the Warner-Cramton act a license issued to a retail liquor dealer is not property, and does not confer any property right; it is not assignable, and prior to the act of 1911 did not confer any right or privilege to an executor or administrator of a deceased licensee; such license in law is a mere permit, protecting its holder against legal attack for acts which, without the sanction of the license, would be illegal and punishable. 23 Cyc. pp. 110, 111, 155; *People* v. *Schafran,* 168 Mich. 324, 334 [134 N. W.

29].   Under these authorities the death of Mr. Smith terminated his license, and the death of Mr. Greenleaf terminated his license.

"It is the settled law of this State that the primary object of the Warner-Cramton act is to work a gradual reduction of saloons until that number shall not exceed one to each 500 inhabitants of the municipality in which the saloons are situate. *Rhode* v. *Wayne Circuit Judge*, 168 Mich. 683 [131 N. W. 523, 135 N. W. 457]; *Ploof* v. *Bangor Township*, 168 Mich. 697 [134 N. W. 3, 135 N. W. 273].

"It is also a well-settled principle of statutory construction in this State that where a given act, or series of acts, show a primary object to be carried out thereby, the general intention of the legislature will be carried out, regardless of the circumstances that the correct rules of grammatical construction of the act, and the recognized general rules of statutory construction as applied to the act, and the standard rules of definition of words in the act might singly or together lead to a different conclusion.  This principle is illustrated by the case of *Drake* v. *Industrial Works*, 174 Mich. 622 (140 N. W. 933), and *Ploof* v. *Bangor Township*.

"Considering that the death of Mr. Smith and of Mr. Greenleaf *terminated and canceled two licenses,* and left no power or authority in any one to apply for a license in place of either, the quoted rules would seem to force the conclusion that not more than four bonds could be approved in Pinconning for the year commencing May 1, 1913.   But this question is most conclusively determined by the decision in *Ploof* v. *Bangor Township,* and the statements of the court in that case herein-below quoted.   The facts in issue in that case, and the question of statutory construction involved therein, and the decision reached and language below quoted, settle the question in this case, and require a decision of this court sustaining the temporary injunction.   The court says (168 Mich. page 699 [134 N. W. 4]):

"'It is urged that a license can only be surrendered by the holder thereof discontinuing the sale of liquor at retail thereunder while it is still in force, and that the mere failure of the holder (or another) to apply for a renewal thereof at the

expiration of the term does not amount to a "voluntary surrender." We are unable to agree with this contention. A careful reading of the whole act (No. 291, Pub. Acts 1909), and particularly section 39 thereof, convinces us that the primary object of the legislature was to work a gradual reduction in the number of saloons until that number should not exceed one to each 500 inhabitants. * * * We have no hesitation in holding that where a license expires by *limitation,* and neither the holder thereof nor any other duly qualified persons make application therefor before the beginning of the ensuing license year, that license must be held to have been voluntarily surrendered within the meaning of the act, and it cannot thereafter be renewed until, under the provisions of the law, the population of the municipality has grown sufficiently to warrant its issuance.'

"On the rehearing (168 Mich. page 701 [135 N. W. 273]):

" 'Under the situation actually presented, we must decide whether a new applicant is entitled to take the place of the holder of a license, when the old holder declines, for any reason, to ask for a renewal thereof, where the ratio of saloons to population is greater than one to 500. * * * We are of the opinion that the total number of licenses to be granted must be held to have been diminished by one on account of the failure of an old holder to apply for a renewal; that as to that license it must be held to have been voluntarily surrendered, within the meaning of the act. We are led to this conclusion by a consideration of the evident purpose of the legislature, as evidenced by the whole act, which was to gradually work a reduction of the number of saloons until they reached the ratio fixed by the statute, and to effect this end without undue hardship to those already engaged in the business. It is, we think, clear that, but for this latter consideration, the legislature would have at once fixed the number of licenses to be granted at the statutory ratio.

" 'These conclusions do not necessarily mean that the legislature sought to, or did in fact, create a property right in the holder of a license to a renewal thereof. It means only that, so long as the holder of a license is able to meet the requirements of the licensing body, and move it to exercise its discretionary power of selection in his behalf, he shall be permitted to remain in the business, even though by so doing the number of saloons continues to be higher than the ratio fixed

by the statute. When he fails to apply for a renewal, then the number to be granted is reduced by one, if the number in force is greater than the statutory ratio. Any other construction would clearly prevent any *sensible* reduction in the number of saloons, to effect which was, as we have seen, the cardinal object of the legislation.'

"It follows from what has been said that the motion to dissolve the temporary injunction must be denied."

That the death of a saloonkeeper constitutes a surrender of his license within the meaning of the Warner-Cramton act is in our opinion the proper construction of that act.

In the absence of legislation to the contrary, upon the death of the licensee, the privileges conferred by the license do not pass to or vest in his personal representatives, nor are they authorized to continue the business at retail. The right to carry on the business is in the nature of a personal license to the party who complies with the statute, and it cannot be said to pass over to the administrator at the death of the party holding it. 23 Cyc. p. 155; *People* v. *Sykes*, 96 Mich. 452-454 (56 N. W. 12) ; *Fuchs* v. *Grass Lake Common Council*, 166 Mich. 569 (132 N. W. 96).

By the provisions of Act No. 170, Public Acts of 1911 (2 How. Stat. [2d Ed.] § 5094) (which, however, does not apply to this case because it did not take effect until after the two deaths here involved), the administrator of a deceased licensee was "privileged to continue in the business under the license of the deceased licensee for the remainder of the year, upon filing a new bond." In our opinion this amendment establishes two things: *First*, it recognizes that prior to its adoption a license was surrendered by the death of a licensee; *second*, it adds a period of grace to the life of the license, upon certain conditions. At the end of the year for which the license was granted, however, the license expires, and no authority is vested in the administrator to apply for

a renewal of the license. There being no one in a position to apply for and receive a renewal of the license as a representative of the deceased. licensee, that license must therefore be considered as surrendered, or given up.

Under the statute then in force (act of 1909), the death of Mr. Smith and Mr. Greenleaf terminated their licenses. These were not involuntary surrenders in the sense that the licenses were taken away upon convictions of violations of the liquor law, but were voluntary surrenders within the meaning of the Warner-Cramton act, in that the licensees failed to apply for and were unable to accept renewals.

What is the meaning of the phrase "voluntary surrender" as used in this act? Does it mean that the holder of a license must voluntarily come forward and by an expression of his will let the licensing authorities know that he no longer intends to act under the license? Or does it mean that, unless the licensee does actually come forward, and is in a position to claim and hold a license for the ensuing year, he will be considered, in the eye of the law, to have voluntarily surrendered his license? A reference to Webster's and the Century Dictionary shows that the word "voluntary" means "produced in or by an act of choice," and it also means "acting of itself," or "spontaneous." Taking into consideration the object of the act, as heretofore construed by us, it should be held that the surrenders here involved, occurred "acting of themselves," or "spontaneously," when certain conditions existed, or certain events occurred, or failed to occur. This construction is not only consistent with the language of the act, but is in accord with the purpose of the act.

3. That the attorney general is a proper party to proceedings to prevent the violation of a law, by public officers, and to institute proceedings of this nature,

see *Attorney General* v. *City of Detroit*, 26 Mich. 263; *Attorney General* v. *City of Detroit*, 71 Mich. 92 (38 N. W. 714); *Attorney General* v. *Board of Auditors of Wayne County*, 73 Mich. 53 (40 N. W. 852); *Mc-Mullen* v. *Ingham Circuit Judge*, 102 Mich. 608 (61 N. W. 260); *Village of Wolverine* v. *Cheboygan Circuit Judge*, 162 Mich. 713 (127 N. W. 744).

We think that the bill stated a case for equitable relief. We find no occasion to interfere with the action of the circuit judge, and the writ of mandamus is denied, with costs to respondent.

STEERE, C. J., and MOORE, MCALVAY BROOKE, KUHN, and OSTRANDER, JJ., concurred with STONE, J. BIRD, J., concurred in the result.